[No. 20433.  Department Two.  March 15, 1927.]

*In the Matter of the Estate of* JOHN F. WILLIAMS, *Deceased.*[1]

[1] WILLS (7)—TESTAMENTARY CAPACITY—EVIDENCE—SUFFICIENCY. The burden of proving insanity and want of capacity to make a will resting upon the contestants is not sustained where there is conflicting evidence evenly divided, except as to interested witnesses, the burden of whose testimony was to the effect that the deceased was quarrelsome and on bad terms with all his family, to whom he left nothing.

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered September 20, 1926, dismissing a will contest, upon findings against the petitioner, after a trial on the merits. Affirmed.

*S. M. Bruce,* for appellant.

*Sather & Livesey, C. E. Abrams* and *Walter A. Martin,* for respondents.

TOLMAN, J.—This is a will contest based upon the alleged mental incompetency of the testator. The trial court, after trial on the merits, dismissed the contest,

[1]Reported in 254 Pac. 236.

and the contestants have appealed. There is nothing involved save questions of fact, and under the well settled rule we must find that the evidence preponderates against the finding of the trial court before we can disturb his judgment. With that thought in view we have carefully considered the evidence in the case, going back of the abstract to the statement of facts in many instances, so as to get, if possible, the full force of the testimony.

The deceased, John F. Williams, died October 14, 1925, being then seventy-two years of age, leaving a will, executed a little more than a year before his death and by which he disposed of his estate, ten thousand dollars to St. Luke's Hospital of Bellingham, and the residue to the Odd Fellows Home at Walla Walla, to the entire exclusion of his relatives and natural heirs, who were brothers and a sister.

The witnesses may be roughly divided into three classes: (1) The relatives, who would or might profit directly or indirectly by the setting aside of the will; (2) neighbors, friends, business associates and the like, who had known the testator for varying lengths of time, a number of them having a more or less intimate acquaintance with him extending over very considerable periods of time; and (3) physicians giving expert testimony.

[1] Appellants' evidence practically all came from witnesses of the first class, and from their testimony it would appear that the deceased was born of a mother who was neurasthenic and hysterical; that a sister with characteristics like the mother became insane and died in a hospital for the insane in early womanhood; that a cousin on the mother's side was insane and left issue that became insane. The testator was the first born of seven children, and was some seven years older than

his next younger brother. It is said that in early childhood the testator was injured by a fall which fractured his skull and destroyed the sight of his left eye, and that he suffered from headaches in childhood and early manhood, though the medical testimony seems to indicate that, if he was insane, his insanity was of the hereditary type rather than such as would follow from this early injury. The testator was always shy, irritable, easily angered, and kept much to himself. From the birth of his brother next younger, he seemed to have an aversion to him, and when they were children he would frequently kick, cuff and abuse the younger brother, and generally he was not kind to any of his younger brothers and sisters.

Testator came to Washington in his early manhood, settled on a homestead in the timber in Whatcom county, never married, lived alone, and, as other members of the family came and settled near him, the evidence indicates that he evinced no brotherly affection nor even much, if any, affection for or interest in his mother. He seems to have been particular in his financial dealings with his family. He exacted the repayment of money loaned to his mother, without consideration of her financial condition, never contributed anything to his mother's support, and when the mother died he was insistent upon what he thought to be his proper share of her estate. The mother's estate was settled without litigation and more or less amicably, but some feeling seems to have grown out of it which was never overcome. Later he had trouble with one of his brothers over a line fence, they finally came to blows, though the surviving brother admittedly struck the first blow. The testator seems to have accused the sister and the remaining brother of siding against him in the quarrel. There is evidence that the

testator was always quick to anger, that he talked and argued to himself, and that he was exceedingly rude, to say the least, to his sister on several occasions. Many other incidents are mentioned in the testimony, too numerous to be here set out or commented upon, but all tending to show a steady dislike for the brothers and sister on the part of the testator, which continued to the time of his death.   ·

Upon the other hand, the neighbors, business associates and the like, in very large number, testified with practical unanimity that the deceased, though living alone much of the time, was cleanly and neat in his habits, intelligent and interested in affairs generally, a reader of the newspapers and of popular magazines, a keen business man, always insisting upon his own, and yet just, successful in amassing a considerable fortune for a man in his surroundings, but a man much set in his opinions, who could not be argued out of any · position which he had taken.   Clearly he was a man of strong prejudices, but all of this class of witnesses believed him to be entirely sane.   The medical testimony was evenly divided, three physicians testifying for the contestants, and all agreeing, in answer to a hypothetical question which fairly embodied the facts stated in the testimony of the witnesses of the first class, that in their opinion those facts indicated insanity.   None of these physicians had any personal acquaintance with the testator.   Three physicians also testified for the contestees, of whom one had been testator's physician for a period of some ten years. These in answer to the same sort of question unhesitatingly expressed the opinion that the testator was sane.   Reading all of this medical testimony carefully, including the cross-examination of each witness, it clearly does not preponderate against the finding of

the trial court, but rather, we think, tends to support that finding.

Appellants' evidence gives us but a one-sided view of the unfortunate family quarrel, and it is common experience that such quarrels may spring from less and be far more bitter than quarrels arising between those unrelated by blood. Boundary disputes between neighbors, and between nations, have been common since mankind began to claim exclusive ownership and right of possession, and it is common knowledge that such quarrels are as bitter and stubborn as any. If we had the decedent's version of how the trouble arose, his actions toward the members of his family might appear less strange and unnatural. A survey of the entire testimony leads us irresistibly to the conclusion that it does not preponderate against the findings of the trial court, but, on the contrary, tends to support them. The rule of law applicable in such cases is stated in 28 R. C. L. 90, as follows:

"An unjust will is, however, not necessarily an irrational act, for a testator possessed of mental capacity may make an unreasonable and unjust will, and may even disinherit his children. His aversion to his relations is not evidence of insanity, especially where he had reasonable grounds for disliking them, and, in general, the mere fact that a testator has exercised his lawful power to disappoint the reasonable expectations of those nearest him, and the natural and proper objects of his bounty in the opinion of the community, and has therefore done an apparently unnatural and unjust thing, is not to be regarded as unreasonable in the sense of evidencing mental incapacity."

. In arriving at the views herein expressed we have endeavored to follow the rules of law heretofore laid down by this court in cases involving will contests. See: *Converse v. Mix,* 63 Wash. 318, 115 Pac. 305;

*Points v. Nier,* 91 Wash. 20, 157 Pac. 44; Ann. Cas. 1918 A, 1046; *In re Geissler's Estate,* 104 Wash. 452, 177 Pac. 330; *In re Rutherford's Estate,* 110 Wash. 148, 188 Pac. 27; *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682; *In re Anderson's Estate,* 114 Wash. 591, 195 Pac. 994.

The burden of proving the illegality of a will rests upon the person contesting under and by virtue of our statute (ch. 156, Laws of 1917, p. 642), and we are clear that the appellants have not met this burden. The judgment is therefore affirmed.

MACKINTOSH, C. J., BRIDGES, PARKER, and ASKREN, JJ., concur.