[No. 23740. Department Two. August 25, 1932.]

*In the Matter of the Estate of* JOHN W. SIMPSON,
*Deceased.*

LEMUEL L. SIMPSON *et al., Appellants,* v. SPOKANE &
EASTERN TRUST COMPANY, *as Executor, et al.,*
*Respondents.*[1]

*E. H. Belden* and *Jas. A. Williams,* for appellants.
*Brown & Weller,* for respondents.

MAIN, J.—This is a will contest. John W. Simpson, a resident of the city of Spokane, this state, died testate in that city October 14, 1930. His will was admitted to probate October 17, 1930. Subsequently, certain heirs of the testator presented a petition asking that the probate of the will be set aside, and that the will

[1]Reported in 14 P. (2d) 1.

be held to be of no effect. The cause came on for trial, and resulted in findings of fact from which it was concluded that the claim of the contestants was not well founded. Judgment was entered sustaining the will and the probate thereof, from which the contestants appeal.

The facts may be summarized as follows: John W. Simpson, the testator, and his wife, Millie, for many years resided in the eastern part of this state, near the town of Garfield. They acquired considerable property, which was of the appraised value of approximately sixty-five thousand dollars. In 1920, Mr. and Mrs. Simpson moved to Spokane, where they resided until the death of Mrs. Simpson in January, 1927.

No children were born of their marriage, but about the year 1901 they took a baby boy, then only a few weeks old, into their home and named him Joe H. Simpson. Joe was never adopted by Mr. and Mrs. Simpson, but they brought him up as though he were their own child. After Mrs. Simpson's death, Joe and Mr. Simpson continued to live in the Simpson home in Spokane, doing their own housework and cooking, until the death of Mr. Simpson.

In January, 1930, Mr. Simpson had a slight stroke of paralysis or hemorrhage of the brain that affected his right hand and arm to some extent. In May, 1930, he had a similar stroke, and on the evening of October 8, 1930, he had a third stroke. On the following day, a physician was called, and he informed Mr. Simpson that he should get his business affairs in shape, as he might die at any time.

October 11, two days after the visit of the doctor, and which was a Saturday, James A. Brown, an attorney of Spokane, who had attended to legal matters for Mr. Simpson for about two years, was called to the home to draw the will. Mr. Simpson was in bed in

an upstairs room, and Mr. Brown talked with him for twenty or thirty minutes to ascertain the data necessary to enable him to draw the will. Mr. Brown then went to a downstairs room, and there drew the will in longhand. It was taken upstairs, Mr. Simpson executed it, and it was properly witnessed.

In the will, the Spokane & Eastern Trust Company was named as executor and trustee. The will, after making the ordinary preliminary provisions that are found in such an instrument, and two or three small bequests, devised and bequeathed the remainder of the estate to Joe H. Simpson, the foster son. Mr. Simpson died, as stated, three days later, and on Tuesday of the following week.

For a number of years, there had lived as a neighbor to Mr. Simpson one Carl O. Anderson, and Mr. Simpson and he were close personal friends. After the third stroke, and up to the time of Mr. Simpson's death, Anderson was almost constantly with him. On Monday preceding the day on which Mr. Simpson died, and he was then in a comatose state, Anderson told the foster son that Mr. Simpson wanted to change his will, leaving everything to him, Anderson, but that, if Joe would give him a per cent of the estate, he would see that the will was not changed. Joe accordingly signed a note in favor of Anderson for $7,500, and afterwards executed deeds to him for two pieces of property, for which credit was given on the note for $5,000 and a new note given for the balance of $2,500. Subsequently, an action was brought by Joe against Anderson to cancel and set aside the documents which he had executed, and that action had not been tried at the time of the trial of this action. The contestants are a brother of the testator and a number of nephews and nieces.

In the petition to set aside the will and the probate

thereof, it was alleged that the testator, at the time he executed the will, was mentally incompetent, and that he was subject to undue influence. Upon the appeal, the charge of mental incompetency is not urged, and the question here presented is one of undue influence only. There is not a word of testimony as to anything said by Anderson to the testator with reference to the making of a will after the testator had the third stroke and prior to his death. Anderson was not called by either side to testify upon the subject of undue influence. There is no testimony showing undue influence or supporting facts from which such influence could properly be inferred.

In the texts and adjudicated cases, what would constitute undue influence has been defined in different phraseology. In essence, they all substantially come down to stating, in effect, that such influence, which would vitiate a will, must be shown by the evidence to be such that the testator's volition, at the time of the testamentary act, was controlled by another, and that the will was not the result of a free exercise of judgment and choice. *In re Roy's Estate*, 113 Wash. 277, 193 Pac. 682; *In re Seattle's Estate*, 138 Wash. 656, 244 Pac. 964.

In the case now before us, Anderson had an opportunity to influence the testator's mind, if it could be subject to his influence, but mere opportunity to influence is not sufficient, even when coupled with an interest or motive, to sustain a finding of undue influence. *In re Patterson's Estate*, 68 Wash. 377, 123 Pac. 515.

There is considerable testimony in the record on the relations existing between Joe and his foster father, and upon what the latter had said with reference to Joe and how he intended to dispose of his property. In support of the will, there was called a large number

of witnesses who had been friends or neighbors of Mr. and Mrs. Simpson, some of them for many years, who testified that the relation between Joe and Mr. Simpson was such as would ordinarily exist between father and son, and that Mr. Simpson had repeatedly stated, in effect, that he intended to leave his property to Joe. The contestants called witnesses who gave testimony to the contrary effect, but the great weight of the testimony supports the view that the relation between the foster father and son was such as exists ordinarily between parent and child.

The trial court heard all the evidence in the case, gave it attentive consideration, and at the conclusion of the trial, in a concise and lucid opinion orally stated, in part, as follows:

"Of course, we are often times confronted with conflicting testimony. Witnesses on one side of the question will testify one way and witnesses on the other side will testify directly contrary, and it becomes very difficult sometimes for courts to determine where the truth lies, and that is what we are seeking all the time.

"Now, in this case it seems to me to be very simple in that respect. When the case was opened I asked counsel if they wanted to make a statement of the case and Mr. Williams said that the issues were very simple and they resolved themselves into two propositions: First, whether he was mentally competent to make a will; and second, whether there was any undue influence, and basing my action upon that statement, I didn't go to the trouble of reading the pleadings in the case. I just held these two points in mind, the two points of fact to be determined in this case: First, was the testator mentally competent to make a will; and second, was there any undue influence exerted in the making of the will?

"Now, on both of these questions it seems to me there is not only evidence but evidence that can't be refuted. It is so overwhelmingly established that he was mentally competent to make this will and also that

424

there was no undue influence exerted, it seems to me it is a very simple question for the court to determine.

"Now, as you say, Mr. Williams, there may be inferences drawn. There may be some truth in your suggestion, but there isn't any evidence to support any of those theories. There isn't any evidence here at all that Mr. Anderson had anything to do with influencing Mr. Simpson to make this will. It is true, he was there in the house. He was a friend of Mr. Simpson's. He was with him frequently, as the testimony shows. What he did there we don't know. The evidence is silent."

After reading and giving consideration to all of the testimony, we are in entire accord with the views expressed by the trial court. What was done by Joe and Anderson on Monday, the day before Mr. Simpson died, and when he was mentally incapable of making a will, is reprehensible, of course, and should be severely condemned, but the transaction between them on that day, and subsequently, will not sustain the inference that Anderson had exercised undue influence upon the testator during the days that he was with him prior to the time that the will was executed.

As above stated, Anderson was not called by either side to testify upon the matter of undue influence, and the appellants invoke the general rule that, in instances where a witness is an actor in a transaction which gives rise to the controversy, is presumably favorably disposed towards one of the parties, and that party does not produce him as a witness, it would be presumed that his testimony, if produced, would be unfavorable to such party. That rule, however, is not applicable here, because it cannot be presumed that Anderson, if he had been called as a witness, would have been presumably favorably disposed toward Joe. There was then litigation pending be-

tween them over the transactions that they had had, as already pointed out.

■ Finally, it is contended that the trial court erred in not making an allowance to the appellants to reimburse them for their expenses and a reasonable amount for the services of their attorneys in waging the contest against the will. This is a matter that rested in the discretion of the trial court, and this court will not disturb the holding of that court in the absence of a showing that there was an abuse of discretion. In *In re McKachney's Estate*, 143 Wash. 28, 254 Pac. 455, it was said:

"Contestant further complains that the trial court denied its costs reasonably incurred in the trial. As bearing upon this situation the statute, Rem. Comp. Stat., § 1389, [P. C. § 10020a], says: 'If the probate be revoked or the will annulled, assessment of costs shall be in the discretion of the court.' Here there was no revoking of the probate nor annulment of the will. The contestant was not entitled to costs. *In re Vaughn's Estate*, 137 Wash. 512, 242 Pac. 1094."

In the present case, the trial court did not abuse its discretion in refusing to allow costs and attorneys' fees to the appellants.

The judgment will be affirmed.

TOLMAN, C. J., HOLCOMB, BEALS, and MILLARD, JJ., concur.