[No. 26885.   Department One.   May 12, 1938.]

WILLIAM H. DEAN *et al., Appellants,* v. EDITH M. JORDAN, *as Administratrix, Respondent.*[1]

[1]Reported in 79 P. (2d) 331.

*Todd, Holman & Sprague* and *Lowell P. Mickelwait,* for appellants.

*Robert F. Sandall,* for respondent.

STEINERT, C. J.—This is a will contest, based upon alleged mental incapacity of the testatrix and alleged fraud and undue influence practiced by the beneficiary. The action was tried to the court and resulted in a judgment upholding the will and dismissing the contest proceedings. The contestants have appealed.

The testatrix, Orilla Dean, whose maiden name was Orilla Rogers, married Alvin H. Dean in 1909. She was then fifty-five years of age. Mr. Dean was at that time a widower with three grown children, William H. Dean and George S. Dean, two of the contestants herein, and Carrie Dean Smith, now deceased, wife of Miles R. Smith, and mother of Sybil Smith Wise and Phoebe Smith Redding, the other two contestants. At the time of her marriage, Mrs. Dean was possessed of a considerable estate, presumably inherited from her parents. Apparently, Mr. Dean then had very little property. Mr. Dean's three children, being grown, never lived in the home of their father and his second wife, Orilla Dean.

Alvin H. Dean died in August, 1920, at Felida, in Clark county, Washington. His estate, consisting of a five-acre farm and a small amount of personalty, was decreed by the court to be community property. After appraisement showing a total value of $2,662, the entire estate was awarded to the widow. The proceedings in that estate are in no way involved here, mention thereof being made only for the purpose of showing the character and value of Mr. Dean's property.

On November 20, 1920, Orilla Dean executed a non-

intervention will, wherein she bequeathed the sum of two thousand dollars to each of her two nieces, Ora A. Graham, of Seattle, and Edith May Jordan, then of Tampa, Florida. The remainder of her estate she devised and bequeathed to the children of her deceased husband. The will designated Miles R. Smith, husband of Carrie E. Smith and father of two of the contestants above named, as executor. Carrie E. Smith died about the year 1932. Ora A. Graham, one of the nieces above mentioned, is the person against whom are made the charges set forth in contestants' petition in this proceeding.

Shortly after the execution of her will, Mrs. Dean delivered it into the custody of Miles R. Smith. At about the same time, she also delivered to Vancouver National Bank certain securities owned by her, principally United States government bonds, of the aggregate par value of $16,979.68; in the list accompanying the securities, Mr. Smith was named as trustee, or agent, of the owner.

During this period of time, Mrs. Dean, who was then about sixty-six years of age and grief-stricken over the death of her husband, felt very lonely, depressed, and nervous. She wanted to make her home with Mr. and Mrs. Smith at Vancouver, where she was then staying, but they were either unable, or else unwilling, to have her do so permanently. At any rate, they wrote to Mrs. Graham, the niece at Seattle, asking her to come to Vancouver and get her aunt. Within a few weeks, or at most a few months, after November 20, 1920, Mrs. Dean, accompanied by her niece, left Vancouver and went to Seattle.

Unfortunately, Mrs. Dean's condition did not improve after going to live with Mrs. Graham. She became more nervous, depressed, and melancholy, and seems to have become obsessed with the idea that she

had no money, but only "pieces of paper," as she expressed it, although as already stated, she had considerable liquid assets. There is also a suggestion in the record that she developed suicidal tendencies. The situation became so grave that on February 16, 1921, upon the petition of Mrs. Graham's husband, Mrs. Dean was adjudged insane and was committed to the Western State Hospital at Steilacoom. The record in that cause shows that the type of insanity with which she was afflicted was melancholia.

In May, 1921, Ora A. Graham, upon her petition, was appointed guardian of the person and estate of Mrs. Dean. The estate was subsequently appraised at $16,242.90. Shortly thereafter, at Mrs. Graham's request, Mr. Smith forwarded to her all the securities which had theretofore been held by him as trustee for Mrs. Dean and kept in the Vancouver bank. In 1922, Mr. Smith, at the instance of Mrs. Graham, forwarded to her the will which Mrs. Dean had delivered to him in 1920. Before doing so, however, he had the will recorded in the office of the county auditor of Clark county.

Mrs. Dean remained in the hospital at Steilacoom for about six weeks and then was paroled and taken to a private home in Seattle. This was done as an experiment, in the hope that under domestic surroundings Mrs. Dean would improve. However, the experiment did not result satisfactorily, for Mrs. Dean gave unmistakable signs of being irrational, and it was not safe for her to be at large. Upon the advice of a physician, she was taken back to Steilacoom on June 9, 1922. A few weeks later, however, she was again paroled and was then taken to a sanitarium in Puyallup, where she was cared for at a monthly charge of $150. In September of the same year, the Western State Hospital discharged her as improved. She remained

at the sanitarium in Puyallup for almost two years, during which time Mrs. Graham visited her at frequent intervals. While at the sanitarium, Mrs. Dean improved to some extent, both physically and mentally.

In 1924, she was taken to Meridian Sanitarium, which is an old ladies' home in Seattle. There she remained until 1931. This change was made in order to reduce the amount of expense and also to enable her to be nearer to Mrs. Graham. The testimony of all the witnesses who were in a position to observe Mrs. Dean was to the effect that, during this period of seven years, she made a decided improvement and became quite rational, although, because of her age, she was very feeble. However, there was never any judicial proceeding in which it was decreed or declared that Mrs. Dean's sanity had been restored.

It appears from the record that Mrs. Dean, from the time that she first came to Seattle, had the desire to live with Mrs. Graham and on repeated occasions begged to be taken to the latter's home. Accordingly, in 1931, Mrs. Dean was removed to Mrs. Graham's residence, where she lived until her death in 1936. It is without dispute that, while there, she received every attention possible and was made comfortable in every way. It is also clear from the evidence that there was a strong bond of attachment between the aunt and her niece.

On September 20, 1933, Mrs. Dean, who was then seventy-eight years of age, executed the will which is now contested. In that will, she revoked her former will, made Mrs. Graham her sole beneficiary, and also named her as executrix to act without bond or intervention of court. The circumstances under which this last will was prepared and executed form the basis of this contest.

Owing to her advanced age and feebleness and the

grief occasioned by the loss of her husband, which either directly caused her subsequent affliction or at least greatly contributed to it, Mrs. Dean led a rather secluded life in Mrs. Graham's home. Although she was permitted to do as she liked at all times, she preferred to sit quietly in the house and spend her time reading. Visitors called from time to time, but inasmuch as she was reserved by nature and also hard of hearing, it was difficult to carry on any extended conversation with her. She spent some of her time in writing letters, several of which, appearing as exhibits in the record, were written between 1931 and 1933 to a relative residing in Wisconsin. The trial court considered these letters as the strongest bit of evidence produced by respondent, indicating to the court not only a reasonable clearness of intellect on the part of Mrs. Dean, but also a very deep appreciation of what her niece had done for her.

During the last year of her life, and while residing at the home of her niece, Mrs. Dean spent most of her time in the upper portion of the house. This was because it was difficult for her to go up and down stairs; on one occasion she had fallen, and it was thought that she might injure herself if she should use the stairway.

It appears from the evidence that, shortly before the will in contest was executed, Mrs. Graham consulted her own attorney and requested him to draw a will for Mrs. Dean with Mrs. Graham as the sole beneficiary. This, however, seems to have followed a suggestion made by the attorney himself that Mrs. Dean should have a will drawn. Mrs. Dean herself apparently had no attorney in Seattle.

The attorney did not at any time call on Mrs. Dean personally concerning the will, but drew it according to Mrs. Graham's directions. Thereafter, the will was

executed before two neighbor ladies acting as witnesses, Mrs. Graham also being present at the time. Although the will was not read aloud to Mrs. Dean in the presence of the witnesses, she was asked at the time whether it expressed her desire as to how she wanted her property to go, and she emphatically replied that it did. It also appears that the will lay on Mrs. Dean's dresser for some time before and after its execution.

Owing to the fact that Mrs. Graham, the niece, died a few weeks before Mrs. Dean, the court did not have the benefit of any statement or explanation that Mrs. Graham might otherwise have made regarding the circumstances of the execution of the will or concerning the charges brought against her in this proceeding. While the evidence leaves much to be desired, the trial court was compelled, as are we, to consider the case from the record as made. At the trial, the subscribing witnesses to the will testified to the effect that Mrs. Dean was rational during the period of her residence with Mrs. Graham and at the time of signing the will, and that it was executed voluntarily, free from the influence of anyone.

Mrs. Dean died August 29, 1936, which was nearly three years after she had executed the will in question. Mrs. Graham died suddenly about six weeks prior to her aunt's death. Upon the death of Mrs. Graham, her sister, the respondent Edith M. Jordan, who in the meantime had moved from Tampa to Seattle, was appointed guardian of Mrs. Dean's person and estate, and continued to care for her aunt until the latter's death. Mrs. Jordan was subsequently appointed administratrix with the will annexed of the estate of Mrs. Dean.

While our statement of the case does not exhaust the details shown by the record, it is sufficient to present the questions involved in this appeal.

The first question presented by appellants' assign-

ments of error is whether or not the testatrix possessed testamentary capacity when she signed the will of September 20, 1933. In considering this question, reference should be had to certain well-established principles expressly adopted in this jurisdiction or otherwise generally recognized.

The right to dispose of one's property by will is not only a valuable right, but is one assured by law. *Points v. Nier,* 91 Wash. 20, 28, 157 Pac. 44, Ann. Cas. 1918A, 1046; *In re Murphy's Estate,* 98 Wash. 548, 555, 168 Pac. 175; *In re Tiemens' Estate,* 152 Wash. 82, 88, 277 Pac. 385, 68 A. L. R. 753; *In re Little Joe's Estate,* 165 Wash. 628, 637, 5 P. (2d) 995; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47; *In re Phillip's Estate,* 193 Wash. 194, 202, 74 P. (2d) 1015.

To exercise that right one must, of course, possess testamentary capacity. Rem. Rev. Stat., § 1394 [P. C. § 10021].

The possession of testamentary capacity involves an understanding by the testator of the transaction in which he is engaged, a comprehension of the nature and extent of the property which is comprised in his estate, and a recollection of the natural objects of his bounty. *Hartley v. Lord,* 38 Wash. 221, 80 Pac. 433; *In re Rutherford's Estate,* 110 Wash. 148, 188 Pac. 27; *In re Anderson's Estate,* 114 Wash. 591, 594, 195 Pac. 994; *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682; *In re Vaughn's Estate,* 137 Wash. 512, 242 Pac. 1094; *In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 964; *Eble v. Bloch,* 171 Wash. 223, 17 P. (2d) 867; *In re Forsman's Estate,* 177 Wash. 38, 42, 30 P. (2d) 941; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47.

Where a will, rational on its face, is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks his wishes. *In re Hanson's Estate,* 87 Wash.

113, 120, 151 Pac. 264; *In re Roy's Estate,* 113 Wash. 277, 281, 193 Pac. 682; *In re Seattle's Estate,* 138 Wash. 656, 663, 244 Pac. 964; *In re Riley's Estate,* 163 Wash. 119, 135, 300 Pac. 159.

If the will has been probated, the burden of proof is upon the contestant to establish the illegality of the will. Rem. Rev. Stat., § 1387 [P. C. § 10019]; *In re Williams' Estate,* 142 Wash. 637, 254 Pac. 236; *In re McCombs' Estate,* 164 Wash. 339, 2 P. (2d) 692. Expressed in another way, the contestant has the burden of proving every material fact alleged by him with respect to the will. *Higgins v. Nethery,* 30 Wash. 239, 70 Pac. 489; *Hunt v. Phillips,* 34 Wash. 362, 75 Pac. 970; *In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887; *In re McKachney's Estate,* 143 Wash. 28, 254 Pac. 455; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47.

To overcome a will, the evidence must be clear, cogent, and convincing. *In re Jones' Estate,* 178 Wash. 433, 34 P. (2d) 1111; *In re Johanson's Estate,* 178 Wash. 628, 35 P. (2d) 52; *In re Ney's Estate,* 183 Wash. 503, 520, 48 P. (2d) 924.

But where a condition of general insanity which is not of a temporary kind is once shown to exist, it is presumed to continue, and the burden of overcoming such presumption by proving mental restoration or a lucid interval rests upon him who asserts such facts. *In re Brown,* 39 Wash. 160, 81 Pac. 552, 109 Am. St. 868, 4 Ann. Cas. 488, 1 L. R. A. (N. S.) 540; *Criez v. Sunset Motor Co.,* 123 Wash. 604, 213 Pac. 7, 32 A. L. R. 627; *State v. Saffron,* 146 Wash. 202, 207, 262 Pac. 970; *Fletcher v. Miller,* 185 Wash. 299, 52 P. (2d) 304; Schouler on Wills (6th ed.), §§ 209, 210.

If the proof of insanity existing prior to the execution of a will consists of an adjudication of insanity or a decree declaring the person to be *non compos mentis* and placing him under guardianship, the presumption

is that such person was incompetent to make a will, and the burden is then upon the proponent to overcome such presumption by showing that the sanity of the testator had been restored or that there was a lucid interval at the time of executing the will, or else that the delusion upon which the adjudication of insanity was based did not affect the will. 1 Page on Wills (2d ed.), 276, § 162, 1208, § 710. See, also, 1 Schouler on Wills (6th ed.), § 108; 1 Underhill on Wills 110, § 86; 1 Woerner, American Law of Administration, 48, § 27; Atkinson on Wills, 186, 194, 494; Rood on Wills (2d ed.), §§ 137a, 137b.

The quantum or degree of proof required of the proponent to rebut the presumption of insanity, under such circumstances, is variously stated by the authorities and text-writers, but, according to the weight of authority, and what we conceive to be a proper and reasonable requirement, the proof in rebuttal of the presumption should be clear and satisfactory to the trier of the fact.

Applying these principles, which we have endeavored to set forth as a guide, we are clearly of the opinion, as was the trial court, that the testamentary capacity of the testatrix was established by the evidence. Contestants' case on the question of such capacity rested almost entirely upon the presumption flowing from the adjudication and decree in 1921. They offered little, if any, testimony relating to the period between 1931 and 1936. On the other hand, respondent's testimony covered a period of sixteen years, and particularly that period of time during which the will was executed. We agree with and affirm the decision of the trial court upon the question of mental capacity.

The other contention presented by appellants' assignments of error is that the will was the product of fraud and undue influence exercised by the bene-

ficiary, Ora A. Graham. This phase of the case, while distinct from the question of lack of testamentary capacity, is nevertheless closely related to it. The rules upon the former question are to a great extent applicable to this, and need not be repeated. There are, however, additional rules and principles applicable to the immediate question which should be stated as an aid to the solution of the second problem.

To vitiate a will there must be something more than mere influence. There must have been an undue influence at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515; *In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034; *In re Murphy's Estate,* 98 Wash. 548, 168 Pac. 175; *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682; *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47; *Perry v. Wetzel,* 122 Wash. 129, 210 Pac. 362; *In re Zelinsky's Estate,* 130 Wash. 165, 227 Pac. 507; *Barbee v. Barbee,* 134 Wash. 418, 235 Pac. 945; *In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 964; *In re Riley's Estate,* 163 Wash. 119, 134, 300 Pac. 159; *In re Simpson's Estate,* 169 Wash. 419, 422, 14 P. (2d) 1; *In re Bradley's Estate,* 187 Wash. 221, 59 P. (2d) 1129; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47.

The evidence to establish fraud or undue influence must be clear, cogent, and convincing. *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682; *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47; *In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 964; *In re Jones' Estate,* 178 Wash. 433, 34 P. (2d) 1111; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47.

Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength,

against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will. The weight of any of such facts will, of course, vary according to the circumstances of the particular case. Any one of them may, and variously should, appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.

The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will. *In re Beck's Estate*, 79 Wash. 331, 140 Pac. 340.

Considering the matter in the light of these rules, we believe and hold that the facts in this case did raise a presumption of undue influence, and that the presumption was of such strength as to impose upon the proponent the duty to come forward with evidence sufficient at least to balance the scales and restore the equilibrium of evidence touching the validity of the will. The facts which move us to this conclusion are these: (1) The age and physical 'condition of the testatrix; (2) her prior mental history; (3) the fiduciary and confidential relationship existing between the testatrix and the beneficiary; (4) the op-

portunity to exercise an undue influence; (5) the participation in the procurement of the will; and (6) the unusually large proportion of the estate received by the beneficiary.

But even though we recognize the presumption and the burden thereby imposed, we agree with the trial court that respondent's evidence rebutted the one and satisfied the other. Contestants' assertion of fraud and undue influence has no support in positive evidence, but is wholly dependent upon the force of the presumption. On the other hand, the evidence of respondent was to the effect that the testatrix, though old and feeble, was nevertheless capable of understanding and did understand what she was doing; that she was deeply attached to her niece, the beneficiary under her will, and appreciative of what the niece had done for her.

Nor is there any direct evidence of any act or conduct from which an undue influence could be inferred. The will was perfectly natural. The beneficiary was closely related to the testatrix by ties of blood. She was the nearest in point of location to the testatrix, and there had been a close companionship between them for over fifteen years. No one else wanted or would have the elderly woman at a time when she most needed help. The niece did not force herself upon her aunt, but took her in charge at the request of others. The record of the guardianship is the best evidence that she faithfully and affectionately ministered to her aunt in her declining years.

The full circumstances under which the will was procured no one will ever know, for the niece and the aunt are both dead. But we are unable, in the light of all the circumstances shown, to stamp the will as a product of fraud or undue influence. To

674

the contrary, we believe that it was established by the preponderance of the evidence that the will expressed the true intent and resolution of the testatrix.

The judgment is affirmed.

BEALS, MAIN, HOLCOMB, and GERAGHTY, JJ., concur.

