245 P.2d 951

In re WESTFALL'S ESTATE.

FIRST NAT. BANK OF ARIZONA et al.

v. PROCTOR.

No. 5534.

Supreme Court of Arizona.

June 24, 1952.

Scott & Green, of Phoenix, for appellants.

Moore & Romley, and Wm. P. Mahoney, Jr., of Phoenix, for appellee.

DE CONCINI, Justice.

This is an appeal from two orders of the Superior Court of Maricopa County admitting to probate, as the last will and testament of Elise Westfall, a certain instrument executed by the decedent on April 13, 1950; and the refusal by that same court to admit to probate as the last will and testament of Elise Westfall a certain instrument executed by the decedent on April 29, 1949.

The appellants, First National Bank of Arizona, and Naoma Anderson, hereinafter referred to as contestants, were respectively named as executor and residuary legatee under the will of April 29, 1949, hereinafter referred to as the *former* will. The appellee, Marie Proctor, was the sole executrix, devisee and legatee under the will dated April 13, 1950, which will hereinafter be referred to as the Proctor will.

The lower court admitted the Proctor will to probate. The contestants below brought this appeal on two assignments of error, substantially as follows: (1) that the Proctor will was invalid because

> (a) it was procured by fraud and undue influence,

(b) that the testatrix did not have the necessary testamentary capacity; and (2) that the former will of the testatrix should have been admitted to probate.

Elise Westfall, the testatrix of both the Proctor and the former will, was somewhere between eighty and eighty-five years old when she executed the Proctor will. She was a sickly woman, needing attention, and was very frail. She was afflicted with arthritis, bad eyesight, and was unable to read, write, or use the telephone. Also, according to her doctor, she was afflicted with hardening of the arteries involving the heart and brain.

On March 20, 1950, Mrs. Proctor was interviewed by Mrs. Westfall with reference to being employed by the latter in the capacity of nurse and housekeeper. This was the first time they had met. At that time Mrs. Westfall was without help at home and was living alone. Terms of employment were discussed, and Mrs. Proctor was to receive $30 per week for working from 8:00 a.m. to 4:00 p.m. six days per week. This figure was later raised to $50 per week when Mrs. Proctor agreed to work seven days per week. Mrs. Proctor started work March 23 and quit April 21, eight days after the Proctor will was executed.

Within three weeks of the date of Mrs. Proctor's employment two attorneys were employed by her. The first, F. L. Zimmerman, on April 8th went to the Westfall home at the request of Mrs. Proctor. Mr. Zimmerman testified that he discussed Mrs. Westfall's affairs with her and suggested a power of attorney. No mention of a will was made. After his interview with Mrs. Westfall, Mr. and Mrs. Proctor drove him to his office. On the way to town one of the Proctors said they wanted a deed to the property and Mrs. Proctor said she also wanted a will to Mrs. Westfall's property in her favor. Mrs. Proctor also said she wanted to be paid for her work. Mr. Zimmerman testified as follows:

"Q. In addition to that you say she wanted some pay for her work? .

"A. Yes, I asked her, and asked her, 'If you do get a deed and the will, what about the care of Mrs. Westfall?' 'Well, I want fifty dollars a week.' I said, 'On top of that?' 'Yes,' she said."

Mr. Zimmerman filed a petition, on behalf of the First National Bank of Arizona as guardian for Mrs. Westfall, on April 11 (two days before the will was executed). Mrs. Westfall was declared incompetent and the Bank was appointed her guardian on May 1, 1950.

On April 11, 1950, Mrs. Proctor called Mr. V. L. Hash, another attorney, with reference to preparing a will for the decedent, and according to his testimony she furnished him with the provisions to be incorporated in the will. On April 12, 1950, Attorney Hash came to the Westfall home with a prepared will for the purpose of showing it to Mrs. Westfall, whom he

had not met up until that time. Mr. Hash testified that because Mrs. Westfall spilled ink on the will and tore the paper with the pen, he did not have the will signed that day. On April 13 Mr. Hash came back with another will (the Proctor will), which according to his testimony was drawn up exactly like the first will he drew. At that time he brought his secretary, Florence Lodrick, to act as a witness, and Mrs. Farr a friend of Mrs. Proctor was also present to witness the signing of the will. The will was read to Mrs. Westfall by the attorney in the presence of the two witnesses and they testified that she assented to the provisions of the will. With the assistance of Mr. Hash, she marked an "X" in the place of her signature and the attorney wrote her name on the appropriate line. The witnesses placed their signatures opposite to that of the "X", signifying that they witnessed her making that mark. They also subscribed their names to the will according to the statute. There is no claim by the contestants that the formalities of drawing and executing the Proctor will were not complied with, nor do we see any lack of compliance.

■■ The test which is almost universally applied for determining testamentary capacity is that the testator must be able to understand the natural objects of his bounty, the kind and character of his property and the nature of the testamentary act. Thompson on Wills, 3d Ed., sec. 59. However as stated in Slater v. Phipps, 193 Okl.

267, 143 P.2d 133, "There is no rule by which it may be determined, with precision, where (testamentary) capacity ends and incapacity begins, but this question should be determined from all the facts and circumstances of each particular case".

■ The rule in this jurisdiction is that we view the evidence in the light most favorable to sustain the judgment of the trial court. Ramirez v. Chavez, 71 Ariz. 239, 226 P.2d 143.

■ The evidence in this case is conflicting on the question of the testatrix's testamentary capacity. Mrs. Proctor and Mr. Hash both testified that Mrs. Westfall was competent. The two attesting witnesses who saw her only at the signing of the will and not in excess of 43 minutes and held very limited conversation with her, also testified that she was competent. On the other hand, a number of witnesses who had known the testatrix for years including her doctor testified that she was incompetent. As Justice Lockwood said In re Greene's Estate, 40 Ariz. 274, 11 P.2d 947, 949:

> "It would serve little purpose for us to review and analyze the specific testimony of each witness, as it could be of no value as a precedent in any other case, and would unduly extend this opinion."

Suffice it to say that on the conflicting evidence the trial court found that the testatrix had the necessary testamentary capacity to execute the will, and we will not

disturb that conclusion even though the weight of the evidence be against it.

In this case, the appellants alleged that fraud or undue influence was exercised on Mrs. Westfall by Marie Proctor in obtaining the will to which she was named sole beneficiary. The burden of proof is on the contestant to prove fraud or undue influence. In re Lillie's Estate, 195 Okl. 597, 159 P.2d 542; McNutt v. Gercke, 62 Ariz. 273, 157 P.2d 347. Where a contestant establishes a prima facie case, the person who is charged with fraud or undue influence has the burden of meeting it, that is, the proponent has the duty to produce evidence sufficient at least to restore the equilibrium of evidence touching the validity of the purported will. In re Eakles Estate, 33 Cal.App.2d 379, 91 P.2d 954; Dean v. Jordan, 194 Wash. 661, 79 P.2d 331. Jones on Evidence, vol. 1, sec. 191, states:

" * * * Proponent having made a prima facie case for probate of the will, the burden of going forward with the evidence to establish the existence of fraud or undue influence is cast upon the party asserting the invalidity of the will by reason of those facts—that is, the contestant. In this, he is undoubtedly aided by the presumption discussed above; and, if he makes a prima facie case of undue influence, the proponent is put to the necessity of going forward with evidence to meet it.

"However there are authorities which hold that, where the will was drawn by or at the instance of one who takes substantially under its terms, the burden resting upon the proponent to prove that the will offered in probate is in truth that of his testator includes the burden of proof in the first instance that the will was not induced by fraud or undue influence. * * *"

In Re Bottger's Estate, 14 Wash.2d 676, 129 P.2d 518, 529, the Washington court said:

" * * * It is true, of course, that in the very nature of things a charge of undue influence can rarely be proved by direct evidence and must be established, if at all, by circumstantial evidence. Roe v. Duty, supra [115 Wash. 313, 197 P. 47]; Foster v. Brady, 198 Wash. 13, 86 P.2d 760; In re Schafer's Estate, supra [8 Wash.2d 517, 113 P.2d 41]. Mere suspicion of undue influence is not enough (In re Patterson's Estate, supra [68 Wash. 377, 123 P. 515]; In re Bradley's Estate, 187 Wash. 221, 59 P.2d 1129; In re Schafer's Estate, supra) although we have recognized that in a particular case the facts may be of such a suspicious nature as to raise a presumption of fraud or undue influence, and that unless this presumption is met by evidence to the contrary, it may suffice to overthrow the will. Dean v. Jordan, supra; Foster v. Brady, supra; In re Schafer's Estate, supra. * * *"

That same court in Foster v. Brady, 198 Wash. 13, 86 P.2d 760, held that the very

nature of the circumstances, which are strikingly similar to the instant case, raised the presumption of fraud and undue influence. The court quoted Dean v. Jordan, supra [194 Wash. 661, 79 P.2d 336], and said:

> "* * * Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are: (1) That the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will."

Reviewing decisions from many states, the courts at times use the words "presumption of fraud and undue influence" as to the quantum of proof that is required by a contestant to a will. Then the proponent has the burden of going forward with the evidence to dispel that presumption. Dean v. Jordan, supra; Little v. Sugg, 243 Ala.

196, 8 So.2d 866. However the word presumption is used by these courts in referring to undue influence and fraud, to show a conclusion after certain facts have been elicited.

█ A presumption, in the strict legal meaning of the word, is a rule of law that in the absence of any evidence to the contrary the trier of fact is compelled to reach. Silva v. Traver, 63 Ariz. 364, 162 P.2d 615.

█ The case of Starkweather v. Conner, 44 Ariz. 369, 38 P.2d 311, 314, distinguishes between a presumption and an inference.

> "* * * There is a great difference between an 'inference' and a 'presumption.' An inference is a deduction drawn from certain facts by the reason, while a presumption is an arbitrary conclusion which the law says must be drawn from certain facts, which conclusion may be either reasonable or unreasonable. * * *"

The only true presumption in this case is that the Proctor will when introduced into evidence was valid. Hence, it can be said that every will is presumed to be valid unless the contrary is shown.

The undisputed facts in this case are suspicious in their very nature. Mrs. Proctor did not know the testatrix before she was employed by the latter. Within three weeks' time she contacted two different attorneys and had a will made in her favor

to all of the deceased's property. There was introduced into evidence five different wills of the deceased, three made in 1947, and one made in 1949—being the former will relied on by the contestants, and the Proctor will made in 1950. In each of the former wills, there were specific bequests to the same beneficiaries, four in number. Other beneficiaries were added in these former wills. It is significant to note that in the Proctor will, no mention is made of anyone except Mrs. Proctor. It is also significant that Mrs. Proctor was named executrix; in all the other wills no beneficiary was named executor.

Eight days after the Proctor will was executed, Mrs. Proctor quit her job because she said she had "a good reason to". She never saw nor visited Mrs. Westfall again. She filed a claim for wages with the guardian of the deceased, which claim included the attorneys fee for the execution of the will in question.

The circumstances surrounding the procuring and execution of this will overcomes the presumption of the validity of the will. The only reasonable inference to be drawn from this fact situation is that the will was procured by undue influence. In the absence of any evidence from which a different inference could be drawn, such as in this case, then the inference of undue influence is compelling. Foster v. Brady, supra.

Accordingly, the judgment of the lower court is reversed with instructions to vacate the order admitting the Proctor will to probate, and proceed with the administration of the former will according to law.

Reversed and Remanded.

UDALL, C. J., and STANFORD, PHELPS and LA PRADE, JJ., concur.