FILED
COURT OF APPEALS
DIVISION II

2015 FEB 24 AM 9: 27

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IN RE ESTATE OF<br><br>EVA JOHANNA ROVA BARNES,<br><br>Deceased. | No. 45069-1-II<br><br><br>UNPUBLISHED OPINION |

SUTTON, J. — Michelle Wells[1] and Dennis Wells (collectively "the Wells") appeal the trial court's order on the petition of the Rovas, invalidating Eva Johanna Rova Barnes's 2011 will for undue influence.[2] The Wells argue that (1) they presented sufficient evidence to rebut the presumption of undue influence; (2) the trial court's findings of fact of undue influence were not based on clear, cogent and convincing evidence; and (3) the trial court erred as a matter of law in invalidating Barnes's will. We agree and reverse and remand for a new trial.

---

[1] Michelle Wells, one of the appellants, became Barnes's caretaker. We refer to Michelle Wells as Michelle for clarity. We intend no disrespect.

[2] The respondents are Barnes's nieces and nephew: Vicki Rova Mueller, Karen Bow, Marsha Rova, and John Rova. We collectively refer to them as "the Rovas." We intend no disrespect.

## FACTS[3]

### I. BARNES'S RELATIONSHIP WITH THE ROVAS AND MICHELLE

Barnes died on June 27, 2011 at 94 years old. Barnes's surviving family included her brother's four children, the Rovas. Barnes came to know Michelle as her rural mail carrier and, by the end of Barnes's life, Michelle had become her caretaker.

In March 2009, emergency medical responders found Barnes on her kitchen floor, where she had fallen two and a half days earlier. After she recovered, medical professionals believed that Barnes should temporarily reside at an assisted living facility; the Rovas concurred, as they were "'desperate'" to help Barnes. Clerk's Papers (CP) at 1132 (Finding of Fact (FF) 23). Barnes refused to comply with this advice, and Dr. George Kina, her physician, did not believe he could deny her demand to return home. Before the fire department would allow her to return home, however, Barnes's home needed to be made safe due to her hoarding. In response to the fire department's order, the Rovas and Michelle cleared and discarded newspapers and magazines from walkways and heat sources.

Barnes returned home, but this event was "the beginning of the end" of her relationship with the Rovas. CP at 1134 (FF 29). Barnes felt that her privacy had been invaded, she believed that the Rovas had destroyed her address book, and that the Rovas wanted to place her in a nursing home for the rest of her life, which she feared.[4] Barnes became paranoid and suspicious of the Rovas.

---

[3] Because this case was tried as a bench trial, we derive these facts from the trial court's findings of fact.

[4] The trial court found that Barnes's beliefs about the Rovas were not true.

From April 2009 until her death, Barnes grew increasingly dependent on Michelle. The "gap" between Barnes and the Rovas widened and Barnes told Michelle that she felt ostracized by the Rovas. CP at 1136 (FF 41). After May 2010, Michelle provided all of Barnes's transportation and took her to every appointment with Dr. Kina and Barnes's attorney, Jeff Tolman. Michelle became the only person consistently available and close to Barnes. Barnes was a "strong-minded" woman, and she chose not to maintain her relationship with the Rovas. CP at 1132 (FF 19)

## II. BARNES'S ESTATE PLANNING

Barnes's property was homesteaded by her parents, and she lived there from 1918 until her death. In 2005, after her husband and child died, Barnes executed a will providing that upon her death her estate was to be distributed to the Rovas in four equal shares; she also named Vicki Rova Mueller as her attorney in fact.

In November 2010, Barnes decided that she wanted to remove Mueller as her attorney in fact. On November 17, Tolman set up a meeting in which he acted as mediator between Barnes and Mueller in an attempt to resolve Barnes's dispute with the Rovas, but Barnes did not want to reconcile. In December 2010, Barnes named Michelle her new attorney in fact and in January, 2011, Michelle began writing checks for Barnes.

Tolman had invited Michelle to participate in the November 17 mediation meeting, where Michelle stated in Barnes's presence that the Rovas had thrown out Barnes's address book; this upset Barnes further. Michelle's comments at the mediation meeting and subsequently to others

"fanned the flame" of Barnes's anger toward the Rovas.[5] CP at 1146 (FF 73).

On March 1, 2011, Barnes met with Tolman to execute a new will, but Tolman believed that Barnes was not feeling well so he sent her home when she could not remember the name of one of her nieces. Two days later, Barnes returned to Tolman's office.[6] Before Barnes executed her new will, Tolman engaged in a colloquy with her and he prepared a memorandum that Barnes signed, setting forth her reasons for changing her will. Both Tolman and Dr. Kina, who Barnes had visited just before coming to her appointment to change her will, believed that Barnes had the necessary mental capacity to execute her will that day. Barnes's new will completely disinherited the Rovas and named "Dennis Wells and Michelle Wells" as her sole beneficiaries. CP at 3 (capitalization omitted).[7]

### III. PROCEDURE

Shortly after Barnes's death, the Rovas petitioned the trial court to invalidate Barnes's 2011 will, claiming that Barnes lacked the necessary mental capacity to execute it and that the will was the product of the Wells' undue influence. The Rovas' petition was tried without a jury. After a

---

[5] Michelle made derogatory comments about the Rovas on at least two other occasions in addition to the meeting with Tolman: The Rovas and Barnes jointly owned a rental house located on Barnes's property. In October 2010, Barnes had accused the renters of not paying rent and sent Michelle to confront them. Michelle told the renters that the Rovas wanted to "evict them so that they [the Rovas] could sell the land, develop the properties, and become millionaires," which was not true. CP at 1138 (FF 46). In May 2011, Michelle stated during an interview at Barnes' church that John Rova tried to "throw [Barnes] under the bus a couple times." CP at 1145 (FF 72).

[6] Michelle provided Barnes transportation to the meeting but was not present when Barnes' executed the will.

[7] Michelle was named as the personal representative, with Dennis Wells designated as the alternate personal representative.

4

lengthy bench trial, the trial court entered 83 findings of fact and 23 conclusions of law. The trial court ruled that Barnes had the mental capacity to execute the 2011 will, but invalidated the will as the product of Michelle's undue influence.

## ANALYSIS

### I. STANDARD OF REVIEW

The Wells do not challenge any of the trial court's findings of fact. Unchallenged findings of fact are verities on appeal. *In re Estate of Lint*, 135 Wn.2d 518, 533, 957 P.2d 755 (1998). Accordingly, we accept as true all of the trial court's findings of fact.

Though the Wells do not challenge the findings of fact, they assign error to conclusions of law 11, and 13 through 22. We review conclusions of law de novo and our review is limited to whether the unchallenged findings of fact support the conclusions of law. *In re Estate of Haviland*, 162 Wn. App. 548, 561, 255 P.3d 854 (2011); *Fuller v. Emp't Sec. Dep't*, 52 Wn. App. 603, 605, 762 P.2d 367 (1988). We consider the findings in the light most favorable to the prevailing party, here the Rovas. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013), *review denied*, 179 Wn.2d 1011 (2014).

### II. UNDUE INFLUENCE

The law presumes that a facially rational, legally executed will is valid. *Dean v. Jordan*, 194 Wash. 661, 668, 79 P.2d 331 (1938). The trial court's function is not to assess the soundness of the testator's disposition of his or her property because the testator is allowed to dispose of property in any lawful manner. *In re Bottger's Estate*, 14 Wn.2d 676, 708, 129 P.2d 518 (1942).

A trial court may set aside a will, however, if a will contestant proves with clear, cogent, and convincing evidence that the will is a product of undue influence. *Haviland*, 162 Wn. App. at

558. Clear, cogent, and convincing evidence must convince the trier of fact that the fact is highly probable by weighing and evaluating evidence and making credibility determinations. *Haviland*, 162 Wn. App. at 558.

To invalidate a will for undue influence, a will contestant must show more than "mere influence." *Dean*, 194 Wash. at 671. Undue influence is influence that controlled the testator's volition, interfering with the testator's free will and destroying free agency. *Haviland*, 162 Wn. App. at 557-58; *Bottger's Estate*, 14 Wn.2d at 700. The influence must be "'tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will.'" *Lint*, 135 Wn.2d at 535 (quoting *Bottger*, 14 Wn.2d at 700). The mere fact that the will proponent offered "advice, arguments, persuasions, solicitations, suggestions or entreaties [is] not enough to establish undue influence." *In re Melter*, 167 Wn. App. 285, 313, 273 P.3d 991 (2012).

The seminal *Dean* opinion outlined "certain facts and circumstances" that may raise a rebuttable presumption of undue influence:

> The most important of such facts are: (1) That the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will. The weight of any of such facts will, of course, vary according to the circumstances of the particular case. Any one of them may, and variously should, appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.

*Dean*, 194 Wash. at 671-72.

Significantly, the will proponent does not have the burden to *disprove* undue influence to overcome the presumption. *Kitsap Bank v. Denley*, 177 Wn. App. 559, 578-79, 312 P.3d 711

(2013). To rebut this presumption, the will proponent must produce evidence "sufficient at least to balance the scales and restore the equilibrium of evidence" regarding the will's validity. *Dean*, 194 Wash. at 672. The presumption does not shift the ultimate burden of proving undue influence, which remains with the will contestant. *Melter*, 167 Wn. App. at 299. The will contestant must provide "positive evidence" to support its claim of undue influence and cannot rely on the "force of the presumption" alone. *Dean*, 194 Wash. at 673.

### III. REBUTTING THE PRESUMPTION OF UNDUE INFLUENCE

The trial court correctly concluded that there was sufficient evidence to support a presumption of undue influence. The trial court also entered conclusions of law 21 and 22, both of which concluded that the Wells did not produce sufficient evidence to overcome the presumption of undue influence. Conclusions of Law 21 and 22 stated as follows:

> 21. Michelle Wells did not produce evidence that this Court finds sufficient to "at least to balance the scales and restore the equilibrium of evidence touching the validity of the will." *In re Estate of Burkland*, 8 [Wn.]. App. 153, [160], 504 P.2d 1143 (1972), [*review denied*], 82 [Wn].2d 1002 (1973). Clear, cogent and convincing evidence establishes that the will signed by Ms. Barnes on March 3, 2011 was the product of ongoing undue influence by Michelle Wells.

> 22. The evidence that was presented on behalf of Ms. Wells was not sufficient to overcome the presumption of undue influence, based not only on the fiduciary relationship, the active participation in procuring the Will and the unnatural disposition, but on all of the other considerations that the Supreme Court says are appropriate to consider, age, health, incapacity, mental vigor, nature and degree of relationships, opportunity for influence and the unnaturalness of the disposition. The will that Ms. Barnes executed on March 3, 2011 is invalid because it was the product of undue influence by Michelle Wells.

CP at 1152-53 (Conclusions of Law 21, 22). The Wells argue that the trial court's findings of fact do not support these conclusions. We agree.

In order to rebut the presumption of undue influence, to "balance the scales and restore the equilibrium of evidence," the Wells had to come forward with evidence that supported an equally plausible explanation for Barnes's testamentary disposition. *Dean*, 194 Wash. at 672. The trial court's unchallenged findings of fact contain more than sufficient evidence that Barnes changed her will for a valid reason, unaffected by undue influence: that she had grown apart from, was suspicious of, and disliked the Rovas.

As Barnes's mental and physical condition deteriorated after her fall in 2009, Barnes became "increasingly involved" and "increasingly dependent" on Michelle. CP at 1135 (FF 38). Michelle became Barnes's "caretaker" while Barnes became "less involved" with the Rovas. CP at 1136 (FF 39). Michelle was the "only person close to [Barnes] on a consistent basis." CP at 1144 (FF 70). Michelle provided all of Barnes's transportation needs because Barnes stopped driving. Barnes became "suspicious" of the Rovas after they cleaned her home and after they suggested that Barnes should enter into an assisted living facility, which Barnes was "desperately afraid" of doing. CP at 1134-35 (FF 34). Barnes told Michelle that she "felt ostracized" from the Rovas. CP at 1137 (FF 44). The Rovas did not choose to become less involved in Barnes's life. Instead, "it was [Barnes's] choice" to become "less involved" with the Rovas. CP at 1136 (FF 39). Barnes was a "strong-minded" woman. CP at 1132 (FF 19). These facts are sufficient evidence to rebut the presumption of undue influence under *Dean* to at least "balance the scales" compared to the Rovas' evidence that created the presumption. *Dean*, 194 Wash. at 672.

The Rovas argue that the trial court's conclusion of law 22, that the will was the product of Michelle's undue influence, is supported by sufficient evidence. The trial court did not, however, make any findings of fact of "positive evidence" of undue influence to specify what constituted Michelle's undue influence. *Dean*, 194 Wash. at 673. Instead, the trial court wholly relied on the presumption in making its conclusions of law regarding undue influence. This reliance on the presumption was error.

The trial court's conclusions of law 21 and 22, stating that the 2011 will was the product of undue influence and that the Wells had failed to overcome the presumption, are not supported by the findings of fact. We hold that conclusions of law 21 and 22 were made in error as a matter of law. Accordingly, we reverse and remand for a new trial.

## IV. ATTORNEY FEES

The Rovas request that we award them attorney fees under RCW 11.24.050 and RCW 11.96A.150. They argue that such an award would be equitable because the Wells' "factual challenge" is meritless. Br. of Resp't at 48. Because the Wells' appeal is not meritless, we deny the Rovas' request for an award of attorney fees.

We reverse and remand for a new trial, holding that the trial court erred as a matter of law

No. 45069-1-II

in determining that the Wells did not rebut the presumption of undue influence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

We concur:

Johanson, C.J.

Maxa, J.