IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | No. 80155-4-I |
| | ) | |
| JAMES W. JORDAN, | ) | |
| | ) | DIVISION ONE |
| Deceased. | ) | |
| | ) | UNPUBLISHED OPINION |
| BRETT JORDAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMIE ROSENBURG and ROXIE | ) | |
| JORDAN, on behalf of the Estate of | ) | |
| James W. Jordan, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

SMITH, J. — After James Jordan died on March 18, 2019, his youngest daughters, Jamie Rosenburg and Roxie Page (now Jordan), were appointed joint personal representatives of his estate pursuant to a will that James executed in June 2018.[1] Brett Jordan, one of James's grandchildren, subsequently petitioned to have Roxie and Jamie removed as personal representatives and to invalidate James's will, alleging that Roxie and Jamie engaged in fraud and undue influence to induce James to change his will in 2018. Brett appeals the

---

[1] Because some members of James's family share the last name Jordan, we refer to James and his family members by their first names for clarity.

Citations and pin cites are based on the Westlaw online version of the cited material.

trial court's denial of his petition.

We hold that because Brett failed to identify any direct, immediate, and legally ascertained pecuniary interest that would be impaired by the probate of James's 2018 will or benefited by its invalidation, Brett failed to establish his standing to contest the will. Furthermore, even if Brett did have standing, he failed to satisfy his initial burden of production to raise a presumption of undue influence. And Brett's evidence, though sufficient to raise a presumption of fraud, was not sufficient to clearly, cogently, and convincingly overcome Roxie and Jamie's rebuttal evidence. For these reasons, the trial court did not err by denying Brett's petition to invalidate James's will.

With regard to Brett's petition to remove Roxie and Jamie as personal representatives, Brett's contention that the trial court should have removed Roxie and Jamie is premised entirely on his assertion that they engaged in undue influence or fraud to procure James's 2018 will. But because Brett failed to establish fraud or undue influence, the trial court did not err by denying Brett's petition for removal. We affirm.

## FACTS

James Jordan, then a widower, made his last will and testament on June 26, 2018 (2018 Will). The 2018 Will appoints his daughters, Jamie and Roxie, as joint personal representatives (PRs) of James's estate. James died on March 18, 2019, at the age of 94.

On April 3, 2019, Roxie and Jamie petitioned to probate the 2018 Will and

to be appointed joint PRs with nonintervention powers,[2] as contemplated by the 2018 Will. The trial court granted the petition on April 4, 2019, declared the estate solvent, and issued letters testamentary appointing Jamie and Roxie as coexecutors with authority to execute the 2018 Will.

The 2018 Will bequeaths to James's three eldest children, Dana Mauer, Rebecca Curtis, and Mark Jordan, "share and share alike," a property located at 1817 Central Road in Everson, Washington (Everson Property). It also bequeaths $25,000 each to Dana, Rebecca, and Mark; $10,000 each to James's surviving grandchildren; and $5,000 each to two of James's great grandchildren. The 2018 Will bequeaths the remainder of James's estate, including his home and farm property in Bellingham, Washington (Bellingham Property), to Roxie and Jamie. The 2018 Will contains a no-contest clause that disinherits any beneficiary who brings an action that, if successful, would increase that beneficiary's share of James's estate.

On May 6, 2019, 32 days after the letters testamentary were issued, Brett Jordan, one of James's grandchildren, filed a petition requesting that the court remove Roxie and Jamie as PRs. Brett also requested that the court declare the 2018 Will invalid, alleging that it had been procured by Roxie and Jamie's fraud and undue influence. In a supporting declaration filed by Mark, who is Brett's

---

[2] "When nonintervention authority is provided by the court, the personal representative receives the maximum statutory authority to manage the estate" with the objective of "simplify[ing] the probate actions and procedures by minimizing court involvement." For nonintervention probates, "[t]he statutes provide a framework for guidance of the personal representative but allow for substantial independence." 26 B CHERYL C. MITCHELL & FERD H. MITCHELL, 26B WASHINGTON PRACTICE: PROBATE LAW AND PRACTICE § 1:3, at 4 (2d ed. 2015).

father, Mark asserted that his "understanding" after a conversation with James in spring 2018 was that James's estate "was to be distributed equally and fairly." Brett later asserted that contrary to Mark's "understanding" of James's intent, the bequests under the 2018 Will left Roxie and Jamie with roughly 80 percent of James's estate.

On May 17, 2019, the trial court issued a citation[3] to Roxie and Jamie, directing them to appear and show cause why the 2018 Will should not be invalidated and why they should not be removed as PRs.

On June 7, 2019, after receiving briefing and declarations in support of and in opposition to Brett's petition, the trial court held a hearing. The court ultimately denied Brett's petition to remove Roxie and Jamie as PRs. The court also denied Brett's petition to invalidate the will. The court acknowledged that "the petitioners have made some significant serious allegations with regard to the circumstances leading up to Mr. Jordan's will that he signed in 2018." The court went on, however, to "conclude that there is not enough here for the court . . . to proceed." The trial court entered written orders denying Brett's petition to remove Roxie and Jamie as PRs and denying Brett's petition to invalidate the will. The trial court did not make written findings of fact or conclusions of law. Brett appeals.

---

[3] A "citation" is the probate counterpart of a summons and "is the method in probate proceedings for bringing all adverse parties before the court." In re Estate of Van Dyke, 54 Wn. App. 225, 230, 772 P.2d 1049 (1989).

**ANALYSIS**

PETITION TO INVALIDATE WILL

Brett contends that the trial court erred by denying his petition to invalidate the 2018 Will. Because Brett failed to establish his standing to challenge the 2018 Will, we disagree.

Standing is a question of law reviewed de novo. Trinity Universal Ins. Co. of Kans. v. Ohio Cas. Ins. Co., 176 Wn. App. 185, 199, 312 P.3d 976 (2013). Although Roxie and Jamie did not argue the issue of Brett's standing below, "[w]e may affirm on any basis supported by the record whether or not the argument was made below." Bavand v. OneWest Bank, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).

Under RCW 11.24.010, only a "person interested" in a will may contest it. "Person interested" is not statutorily defined, but that term has been in the statute for some time and has been interpreted by our Supreme Court.

In In re Estate of O'Brien, 13 Wn.2d 581, 126 P.2d 47 (1942), our Supreme Court construed REM. REV. STAT. § 1385, a predecessor to RCW 11.24.010. Like the current statute, REM. REV. STAT. § 1385 provided that a will contest could be filed by "any person interested in any will." In holding that an executor named under a previous will was *not* a "person interested" in the will, our Supreme Court observed that "it has been held, not only under statutes such as ours, but also in the absence of statute, that, to contest a will, a person must have an interest therein, and that this interest must be a direct, pecuniary one." O'Brien, 13 Wn.2d at 583. "*In other words, the contestant must stand to lose*

5

*directly in a financial way if the will which he seeks to attack is permitted to stand.*" O'Brien, 13 Wn.2d at 583 (emphasis added). The O'Brien court went on to explain that "'a 'person interested' is one who has a direct, immediate, and legally ascertained pecuniary interest in the devolution of the testator's estate, *such as would be impaired or defeated by the probate of the will or benefited by the declaration that it is invalid.*'" O'Brien, 13 Wn.2d at 583 (emphasis added) (quoting Petitt v. Morton, 28 Ohio App. 227, 235, 162 N.E. 627 (1928)).

By 1952, REM. REV. STAT. § 1385 had been recodified as RCW 11.24.010. See In re Estate of Romano, 40 Wn.2d 796, 807, 246 P.2d 501 (1952). And in Romano, our Supreme Court, citing O'Brien, again confirmed that "a person named as executor in a prior will is not a 'person interested' within the meaning of [RCW 11.24.010] *because the interest therein referred to must be a direct, pecuniary one.*" 40 Wn.2d at 807-08 (emphasis added). The Supreme Court later applied this principle in In re Estate of Becker, holding that an omitted spouse had standing to intervene in a will contest because "[i]f the will is declared invalid, [the] estate will be distributed either intestate or pursuant to a prior will[; and in] either circumstance, [the omitted spouse] would inherit 50 percent of [the] estate, either through intestacy laws or through the omitted spouse statute." 177 Wn.2d 242, 247, 298 P.3d 720 (2013). In other words, the omitted spouse in Becker had standing to intervene because she "would have a significant interest in the estate *if the will were declared invalid.*" 177 Wn.2d at 247 (emphasis added).

In short, it is well established that to have standing, a will contestant must

"'ha[ve] a direct, immediate, and legally ascertained pecuniary interest . . . such as would be impaired or defeated by the probate of the will or benefited by the declaration that it is invalid.'" Becker, 177 Wn.2d at 247 (internal quotation marks omitted) (quoting O'Brien, 13 Wn.2d at 583). Specifically, "the contestant must stand to lose directly in a financial way if the will which he seeks to attack is permitted to stand." O'Brien, 13 Wn.2d at 583; see also EUNICE L. ROSS & THOMAS J. REED, WILL CONTESTS § 3:4 at 56 (2d ed. 2020) (observing, with regard to the "'pecuniary interest' theory of standing": "The courts will not allow people to contest wills when the amount of their share of the decedent's estate is identical no matter which way the court decides the case."). Yet here, Brett does not point to any evidence that he would lose directly in a financial way if the 2018 Will were permitted to stand. For these reasons, we affirm the trial court's denial of Brett's petition to invalidate the 2018 Will on the basis that Brett failed to establish his standing to maintain a will contest under RCW 11.24.010. Cf. In re Estate of Rathbone, 190 Wn.2d 332, 339, 412 P.3d 1283 (2018) ("Once a court declares a nonintervention estate solvent, the court has no role in the administration of the estate except under narrowly, statutorily created exceptions that give courts limited authority to intervene. The court can regain this limited authority only if the executor or another person *with statutorily conferred authority* properly invokes it." (emphasis added)).

Brett contends that he has standing because instead of dividing James's estate equally, the 2018 Will "bequeathed differing cash amounts to different beneficiaries and different property ownership rights to different children." But

7

Brett does not explain how any alleged change between a prior will and the 2018 Will affected *Brett's*—as opposed to *his father Mark's*—pecuniary interests.[4] Indeed, even Mark's declaration is silent as to any alleged understanding about James's intent with regard to his grandchildren. And to the extent that Brett is arguing that he has an interest inasmuch as he will one day inherit from his father, that interest is too remote to be the kind of "'direct, immediate, and legally ascertained pecuniary interest'" necessary to support standing. Becker, 177 Wn.2d at 247 (quoting O'Brien, 13 Wn.2d at 583); cf. Ingersoll v. Gourley, 72 Wash. 462, 471-72, 130 P. 743 (1913) (holding that the successor in interest of a *deceased* person originally entitled to contest a will is also entitled to contest it); Jevne v. Pass, LLC, 3 Wn. App. 2d 561, 567, 416 P.3d 1257 (2018) (holding that "a possible contingent future interest" was insufficient to establish standing). Therefore, Brett's contention fails.

Brett next suggests that Cassell v. Portelance, 172 Wn. App. 156, 294 P.3d 1 (2012), supports the proposition that Brett is a "person interested" in the 2018 Will merely because he is a beneficiary under the 2018 Will. But Brett's reliance on Cassell is misplaced.

In Cassell, the decedent, David Finch, saw Dr. Douglas Portelance several times in 2004 and again in 2006. 172 Wn. App. at 159. Finch complained to Dr. Portelance of rectal bleeding, which Dr. Portelance diagnosed

---

[4] We note here that "[i]n general, cases should be brought and defended by the parties whose rights and interests are at stake." Wash. State Nurses Ass'n v. Cmty. Health Sys., Inc., No. 97532-9, slip op. at 7 (Wash. Aug. 13, 2020), http://www.courts.wa.gov/opinions/pdf/975329.pdf.

as hemorrhoids. Cassell, 172 Wn. App. at 159. In the summer of 2006, a different doctor diagnosed Finch with terminal colorectal cancer. Cassell, 172 Wn. App. at 159.

In August 2007, Finch, who by then was "very weak," executed a will, which named Finch's wife, Rhoda Cassell, as personal representative. Cassell, 172 Wn. App. at 159. Finch died less than a week later. Cassell, 172 Wn. App. at 159. After the probate court appointed her as personal representative consistent with her late husband's will, Cassell sued Dr. Portelance for wrongful death, alleging that he had committed medical malpractice by failing to diagnose Finch's cancer. Cassell, 172 Wn. App. at 159. Dr. Portelance moved to intervene in the probate and moved to vacate the order appointing Cassell as personal representative, arguing that "it was based on a will that had not been signed by a testator with the requisite mental capacity." Cassell, 172 Wn. App. at 160.

On appeal, we treated Dr. Portelance's motion as a will contest under RCW 11.24.010 and concluded that the term "interested" in that statute was not broad enough to include Dr. Portelance's interest as a wrongful death defendant. Cassell, 172 Wn. App. at 163. We explained, citing O'Brien, that "[o]nly an individual who possesses a 'direct, pecuniary interest' in the devolution of the testator's estate may contest a will." Cassell, 172 Wn. App. at 163 (quoting O'Brien, 13 Wn.2d at 591). We also observed, to that end, that any alleged deficiencies in Cassell's appointment as personal representative "were of no legitimate concern to Dr. Portelance." Cassell, 172 Wn. App. at 164. In other

9

words, Dr. Portelance did not have standing because he had no direct, pecuniary interest that would be affected by the outcome of a will contest.

Cassell merely confirms, consistent with O'Brien, Romano, and Becker, that to have standing, a will contestant must "'ha[ve] a direct, immediate, and legally ascertained pecuniary interest . . . such as would be impaired or defeated by the probate of the will or benefited by the declaration that it is invalid.'" Becker, 177 Wn.2d at 247 (internal quotation marks omitted) (quoting O'Brien, 13 Wn.2d at 583). And the fact that Dr. Portelance, who was not a beneficiary under Finch's will, lacked standing does not mean that beneficiary status automatically confers standing under RCW 11.24.010. Cf. WILL CONTESTS § 3:4 at 56 n.8 ("The fact that someone is an heir does not automatically confer standing to challenge a will. For example, if the heir was excluded by testator in an earlier will that would be admitted to probate if the later will was set aside, the heir has no standing to contest the later will."). Accordingly, Cassell does not support Brett's contention that he has standing merely because he is a beneficiary under the 2018 Will.

For the foregoing reasons, we affirm the trial court's denial of Brett's petition to invalidate the 2018 Will on the basis of Brett's failure to establish standing. Because we affirm on this basis, we need not decide whether the trial court erred by denying Brett's petition on the merits. But Brett's additional contention that the trial court erred by denying his petition to remove Roxie and Jamie as PRs is premised entirely on his contention that they engaged in fraud and undue influence. Therefore, we address the merits of Brett's fraud and

10

undue influence claims and conclude that even if Brett had standing, the trial court did not err by denying his claims on their merits.

Standard of Review and Legal Standards

As an initial matter, the parties purport to disagree with regard to the standard of review this court should apply in reviewing the trial court's determination that Brett failed to establish either undue influence or fraud. Quoting Mueller v. Wells, 185 Wn.2d 1, 9, 367 P.3d 580 (2016), Brett contends that "'[w]hen reviewing a will contest, the appellate court's function is to determine whether the trial court's findings are supported by substantial evidence.'" And, he argues, the trial court erred by dismissing his petition because "[t]here is substantial and undisputed evidence that Roxie and Jamie used undue influence and fraudulent inducement to cause [James] to change his will in the last year of his life."

Meanwhile, Roxie and Jamie contend that because the standard of proof in a will contest is clear, cogent, and convincing evidence, an appealing will contestant "must show that it is 'highly probable' that the will was the product of undue influence or fraudulent inducement." They argue that "[b]ased upon the record before the trial court, this court cannot conclude that it is 'highly probable' that [t]he [2018] Will was the product of any [undue] influence." They also argue, "Nor can this court conclude that it is highly probable that [James] relied on [any false] statements in executing [t]he [2018] Will."

In other words, although the parties disagree as to the applicable standard of proof, they both argue that this court should conduct an independent review of

the evidence before the trial court, i.e., that review is de novo.  Brett contends that we must reverse if there is substantial evidence of undue influence and fraudulent inducement, while Roxie and Jamie contend that reversal is required only if this court concludes that it is "highly probable" that the will was the product of undue influence or fraud.

Because the trial court did not make any findings and made its determination based solely on documentary evidence, we are in as good a position as the trial court to determine whether Brett satisfied his burden to establish undue influence and fraud.  See Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wn.2d 243, 252, 884 P.2d 592 (1994) ("'[W]here . . . the trial court has not seen nor heard testimony requiring it to assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence, then on appeal a court of review stands in the same position as the trial court in looking at the facts of the case and should review the record de novo.'" (quoting Smith v. Skagit County, 75 Wn.2d 715, 718, 453 P.2d 832 (1969))).  Accordingly, we agree with the parties that a de novo review of the evidence is appropriate in this appeal.  See In re Firestorm 1991, 129 Wn.2d 130, 135, 916 P.2d 411 (1996) ("When a trial court fails to make any factual findings to support its conclusion, and the only evidence considered consists of written documents, an appellate court may, if necessary, independently review the same evidence and make the required findings."); Foster v. Gilliam, 165 Wn. App. 33, 54, 268 P.3d 945 (2011) (observing that "in general, the standard of review is de novo in probate proceedings for decisions based on declarations,

affidavits, and written documents" but applying substantial evidence review because of the "extensive documentary record in [that] case").

We decline, however, to apply "substantial evidence" or "highly probable" review as the parties describe those standards. Specifically, had the trial court made findings, our review of those findings would be for substantial evidence in light of the "highly probable" test that applies when the standard of proof is clear, cogent, and convincing evidence. See In re Trust & Estate of Melter, 167 Wn. App. 285, 301, 273 P.3d 991 (2012) ("When a challenged factual finding is required to be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting substantial evidence review. . . . When such a finding is appealed, the question to be resolved is not merely whether there is substantial evidence to support it but whether there is substantial evidence in light of the 'highly probable' test."). But here, the trial court did not make findings, and therefore those standards do not apply. Similarly, because the trial court did not make credibility determinations, we do not view the evidence in the light most favorable to the party that prevailed below, as Roxie and Jamie urge us to do. See Ottis v. Stevenson-Carson Sch. Dist. No. 303, 61 Wn. App. 747, 756, 812 P.2d 133 (1991) (explaining that taking the evidence in the light most favorable to the prevailing party below is a means by which the appellate court accepts the trial court's credibility determinations and choice of reasonable inferences). Instead, because review is de novo, we simply apply the standards of proof that ordinarily apply to claims of undue influence and fraudulent inducement. These standards are set forth in the

13

discussion below.

## Undue Influence

"The right to testamentary disposition of one's property is a fundamental right protected by law," and "[a] will that is executed according to all the legal formalities is presumed valid." Mueller, 185 Wn.2d at 9. "Nevertheless, a will executed by a person with testamentary capacity may be invalidated if 'undue influence' existed at the time of the testamentary act." Mueller, 185 Wn.2d at 9. "'Undue influence' that is sufficient to void a will must be 'something more than mere influence but, rather, influence which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.'" Mueller, 185 Wn.2d at 10 (internal quotation marks omitted) (quoting In re Estate of Lint, 135 Wn.2d 518, 535, 957 P.2d 755 (1998)).

"Circumstantial evidence may be used to establish suspicious facts that raise a presumption of undue influence." Mueller, 185 Wn.2d at 10. In Dean v. Jordan, 194 Wash. 661, 79 P.2d 331 (1938), our Supreme Court "identified certain suspicious facts and circumstances that could raise a presumption of undue influence." Mueller, 185 Wn.2d at 10. "'The most important of such facts are (1) That the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate.'" Mueller, 185 Wn.2d at 10-11 (quoting Dean, 194 Wash. at 672). "'Added to these may be other considerations, such

14

as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will.'" Mueller, 185 Wn.2d at 11 (quoting Dean, 194 Wash. at 672). "If the facts raise a presumption of undue influence, the burden of production shifts to the will proponent, who must then rebut the presumption with evidence sufficient to 'balance the scales and restore the equilibrium of evidence touching the validity of the will.'" Mueller, 185 Wn.2d at 15 (quoting Dean, 194 Wash. at 672).

We conclude, applying the Dean factors, that Brett failed to sustain his initial burden to raise a presumption of undue influence sufficient to require Roxie and Jamie to produce rebuttal evidence.

### Dean Factor 1: Confidential Relationship

The crux of a confidential relationship "is a level of trust that leads the testator to believe that the beneficiary is acting in his or her best interests, creating an opportunity for the beneficiary to exert undue influence." Mueller, 185 Wn.2d at 11. "While a confidential relationship is more likely to exist between parent and child, parentage alone does not create the relationship." Lewis v. Estate of Lewis, 45 Wn. App. 387, 390, 725 P.2d 644 (1986). Rather, "[t]he essential elements of a confidential relationship are (1) that the parent reposes some special confidence in the child's advice *and* (2) that the child purports to advise with his parent's interests in mind." Lewis, 45 Wn. App. at 391.

Here, Brett asserts that a confidential relationship existed because Roxie

and Jamie were James's main caretakers, Roxie and Jamie "had control over everything from [James's] food to when his soiled sheets were cleaned," and "Roxie even admitted to sleeping in [James]'s bed." In support of his assertions, Brett points to a declaration from Roxie in which she attested that after James returned home from cancer treatment in 2006, "Jamie and I provided him with full time care, splitting shifts between the two of us." Brett also points to a declaration from Dana, in which she attested that although the family was "very close knit" for years and "[a]ll the children and grandchildren helped with household duties, cooking, grocery shopping, taking our parents to doctor appointments, chopping wood, and helping with livestock[, i]n the last year of [James]'s life, only . . . Roxie, Jamie, and her children, were permitted to help with chores." Finally, Brett points again to Roxie's declaration, in which she stated that during the last week of James's life, "[Jamie] and I cut an inexpensive, urine soaked shirt off my father's body because we felt that the movement of his joints necessary to remove it in the usual manner would cause him undue pain," and, "In the week before [James]'s death, he experienced frequent periods of extreme cold" and "[d]uring this time, I did lie next to him on his hospice bed . . . to try to keep him warm and provide him with comfort as he was dying."

But even if the cutting off of James's urine-soaked shirt and Roxie's lying next to James in bed are probative of a confidential relationship, it is undisputed that these incidents occurred during the final weeks of James's life, well *after* he executed the 2018 Will. And apart from these two incidents, Brett points to no evidence of a confidential relationship other than the undisputed fact that Roxie

16

and Jamie became James's primary caretakers in 2006.[5]

To that end, Brett cites no authority to support the proposition that Roxie and Jamie's status as James's primary caretakers alone is enough to establish a confidential relationship. Instead, in McCutcheon v. Brownfield, the case on which Brett relies, we explained that a confidential relationship between parent and child may exist when the parent becomes "dependent upon the child, either for support and maintenance, or for care or protection in business matters as well or for both, *and the child, by virtue of factors of personality and superior knowledge . . .* [*assumes*] *. . . the role of adviser accepted by the parent.*" 2 Wn. App. 348, 357, 467 P.2d 868 (1970) (emphasis added). Here, Brett does not point to any evidence that before the execution of the 2018 Will in June 2018, Roxie and Jamie purported to advise James as to his affairs or that James accepted them as advisors. Accordingly, we conclude that the first Dean factor does not weigh in Brett's favor. Cf. Lewis, 45 Wn. App. at 391 (concluding that mother and son did not share a confidential relationship where the mother lived with the son and valued his opinions but "was not dependent on his advice to form the basis of her decisions"); Mueller, 185 Wn.2d at 11 (confidential

---

[5] Brett's statement of facts asserts a number of facts that he does not refer to later in the argument section of his brief. In analyzing Brett's arguments, our focus is on the portions of the record to which Brett refers in support of each argument. See RAP 10.3(a)(6) (providing that the argument section of a brief must contain "references to relevant parts of the record"); cf. Lint, 135 Wn.2d at 532 (court will not assume obligation to comb the record for evidence to support counsel's arguments). That said, the additional facts in Brett's statement of facts either (1) are based on declarations that fail to establish personal knowledge of the relevant fact, (2) describe events that occurred after James executed the 2018 Will, or (3) would not in any event change our analysis.

relationship existed where the will proponent was the decedent's attorney-in-fact at the time the will in contest was signed); In re Estate of Eubank, 50 Wn. App. 611, 620, 749 P.2d 691 (1988) (confidential relationship existed between the testator and her brother not merely because they were siblings, but because the brother had obtained a general power of attorney from the testator).

*Dean Factor 2: Active Participation*

"The second Dean factor requires that the beneficiary's actions bring about or affect the testamentary instrument." Mueller, 185 Wn.2d at 12. Here, Brett's assertion that Roxie and Jamie actively participated in the preparation or procurement of the 2018 Will is premised entirely on (1) his speculation that Jamie (or Roxie) was the one who telephoned James's attorney, Lesa Starkenburg-Kroontje, about changing James's will in 2018 and (2) the fact that Jamie drove James to Starkenburg-Kroontje's office on the day that James executed the 2018 Will.

But "[p]articipation in the transaction sufficient to support a presumption of undue influence requires that the beneficiary actively dictated the terms of [the] transaction, purportedly on behalf of the decedent." Kitsap Bank v. Denley, 177 Wn. App. 559, 577, 312 P.3d 711 (2013). Thus, for example, in In re Estate of Malloy, our Supreme Court concluded that the will proponent was not an active participant where there was "no evidence that [the will proponent] participated in the preparation or procurement of the will," even though "the attorney [the decedent] selected was one of those [the proponent] recommended . . . and . . . [the proponent] drove [the decedent] to the attorney's office on both occasions."

57 Wn.2d 565, 570, 358 P.2d 801 (1961).  And in Mueller, our Supreme Court confirmed, citing Malloy, that "the mere act of driving [the decedent] to the meeting with her attorney is not sufficient in and of itself to satisfy this Dean factor."  185 Wn.2d at 12.

Here, even if we accept as fact Brett's speculation that Jamie or Roxie called Starkenburg-Kroontje, Brett points to no evidence that Jamie or Roxie "actively dictated the terms of [the] transaction" on behalf of James.  Denley, 177 Wn. App. at 577.  Therefore, Brett fails to establish that Jamie and Roxie actively participated in the procurement of the 2018 Will as contemplated under the second Dean factor.  Cf. In re Estate of Haviland, 162 Wn. App. 548, 566, 255 P.3d 854 (2011) (concluding that will proponent actively participated in the procurement of the challenged will where, among other things, the proponent typed a letter to the decedent's attorney enclosing a copy of the previous will with the proponent's interlineated draft changes).

*Dean Factor 3: Unusually or Unnaturally Large Part of the Estate*

"Under the third Dean factor, the effect of undue influence must manifest in the testamentary instrument in an 'unnatural' or 'unusual' way."  Mueller, 185 Wn.2d at 13.  "'Unusualness' or 'unnaturalness' can be measured by comparison to the decedent's previous testamentary instruments . . . or bequests to other beneficiaries."  Mueller, 185 Wn.2d at 13.  "A will is unnatural 'when it is contrary to what the testator, from his known views, feelings, and intentions would have been expected to make."  Mueller, 185 Wn.2d at 14.

Here, Brett avers that "the will for the majority of [James]'s life was to be

19

distributed equally," and in the 12 years before James executed the 2018 Will, "[James] had not taken steps to change his will." Brett also points out that according to his father Mark, James and Mark's mother, Kathleen, gave Mark the keys to certain lockboxes and safes holding valuable property. Brett contends that this constitutes evidence that James "actually desired that Mark control important portions of the estate." Brett then contends that the 2018 Will is unnatural because it was "specifically not equal" and instead "g[a]ve Jamie and Roxie the majority of the estate." Brett's contention fails for three reasons.

First, Brett points to no evidence that James intended to distribute his estate equally among his children before executing the 2018 Will. He relies on Mark's declaration that after speaking with James alone in the spring of 2018, it was Mark's "understanding" that James's estate "was to be distributed equally and fairly." But Mark's "understanding" is at best just that. It is not competent— much less persuasive—evidence of what James in fact intended or that James intended to distribute his estate strictly equally. Similarly, Mark's declaration that he was given keys to certain lockboxes and safes containing his parents' property is insufficiently probative of James's intent, regarding his estate as a whole, to support Brett's assertions with regard to the unnaturalness of the 2018 Will.[6] Indeed, this case is readily distinguishable from Haviland, the only published opinion that Brett cites. In Haviland, there was ample evidence of the

_____

[6] Because we conclude that Mark's testimony about his "understanding" of James's intent with regard to his estate and James's giving to Mark certain keys to safes and lockboxes do not support Brett's arguments under the third Dean factor, we need not address Roxie and Jamie's contention that Mark's testimony is barred by the dead man's statute, RCW 5.60.030.

decedent's known views, feelings, and intentions in the form of the decedent's earlier trust and estate documents.  See 162 Wn. App. at 553-54, 555.  Here, by contrast, Brett presented no similar evidence of James's prior intent with regard to his estate.

Second, although Brett asserts that James did not take any steps to change his will in the 12 years before James executed the 2018 Will, that assertion is not supported by citation to the record.  And though we are not obligated to do so, we have diligently searched the record and found nothing to support that assertion.  Rather, according to Starkenburg-Kroontje, James "made changes to his estate documents to address life changes at different times within the past twelve years."

Finally, even assuming that a prior will exists in which James distributed his estate equally among his children, Brett points to no evidence in the record to support his contention that the 2018 Will, which bequeathed the Everson Property to Mark, Dana, and Rebecca and the Bellingham Property and the remainder of the estate to Jamie and Roxie, resulted in a comparatively unusual or unnaturally large distribution to Jamie and Roxie.  Specifically, he points to no evidence of the value of the Bellingham Property or the Everson Property, nor does he explain how to account for the 2018 Will's distribution of $185,000 in cash gifts to beneficiaries *other than* Roxie and Jamie.  He also does not cite any authority supporting the proposition that a distribution is *unnatural* merely because it is *unequal* among siblings.  Cf. Haviland, 162 Wn. App. at 564, 566 (will was unnatural where it "effectively disinherit[ed the decedent's] children, and

cut bequests to charitable organizations by nearly half").  For these reasons, we conclude that the third Dean factor does not weigh in Brett's favor.

*Other Considerations*

In addition to the three main factors under Dean, "'other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will'" may also weigh in favor of finding undue influence. Mueller, 185 Wn.2d at 11 (quoting Dean, 194 Wash. at 672).  These other considerations "speak to the testator's vulnerability to undue influence due to mental or physical infirmity and the nature of the relationship with the beneficiary."  Mueller, 185 Wn.2d at 14.

Here, Brett contends that these other considerations also weigh in his favor because James was in poor health, Jamie and Roxie had the same degree of relationship with their father as their older siblings, Jamie and Roxie were James's caretakers and had "unrestricted opportunity" to exert undue influence, and the will was unnatural for reasons already discussed.  But although Brett presented evidence that James was hard of hearing, weak, and had difficulty moving and walking "[t]hroughout the last year of his life," he does not explain how these physical limitations made James particularly susceptible to undue influence.  Nor does he present any evidence that James experienced any cognitive impairment.  Accordingly, this case is distinguishable from Mueller, on which Brett relies, because in Mueller, the trial court found that the testator was

"'extremely vulnerable to undue influence *due to* physical limitations, [*and*] *some degree of cognitive impairment.*'" 185 Wn.2d at 14 (emphasis added) (alteration in original); see also Haviland, 162 Wn. App. at 567 (other considerations under Dean supported invalidation of will where there was evidence that the decedent "experienced substantial physical disabilities[ *and*] *exhibited symptoms of dementia* as early as 2000," six years before he executed his final will (emphasis added)).

Brett also fails to show that the nature of Jamie and Roxie's relationship with James weighs in favor of a finding of undue influence, or that the will was unnatural. Brett implies that Jamie and Roxie should have received the same distribution as their other siblings because "[t]hey all had the same degree of relationship." But as before, Brett cites no authority for the proposition that a will is unnatural merely because it is unequal among siblings. Indeed, this case is again distinguishable from Mueller, where the testator made a "'radical and unnatural change to her prior wills'" by disinheriting her closest living relatives with whom she shared a close family relationship in favor of a woman who was 51 years younger than the testator, was unrelated to the testator, and became consistently involved with the testator only in the last few years of her life. 185 Wn.2d at 14.

Finally, Brett contends that Roxie and Jamie saw to it that they "had unrestricted access to [James]" by attempting to "limit and control [James]'s interactions with [Mark, Dana, and Rebecca]." In other words, Brett contends that Roxie and Jamie had the *opportunity* to exert influence. But "opportunity

alone . . . is not sufficient basis for drawing the inference that undue influence was exerted." In re Estate of Jolly, 197 Wash. 349, 351, 85 P.2d 267 (1938).

*Conclusion: Undue Influence*

Brett does not point to evidence sufficient to satisfy the three most important Dean factors. He also fails to establish the presence of other considerations that weigh in favor of a finding of undue influence. At best, Brett's allegations establish that Roxie and Jamie had the opportunity and the motive to influence James. But "'[m]ere suspicion, even when accompanied by opportunity and motive, is insufficient to raise a substantial inference of undue influence.'" Melter, 167 Wn. App. at 302 (internal quotation marks omitted) (quoting In re Estate of Smith, 68 Wn.2d 147, 157, 411 P.2d 879, 416 P.2d 124 (1966)).

Furthermore, although Roxie and Jamie may have had the opportunity to *influence* James, Brett does not point to any evidence that Roxie and Jamie exerted *undue* influence, i.e., "'influence tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will.'" In re Estate of Kessler, 95 Wn. App. 358, 377, 977 P.2d 591 (1999) (quoting Lint, 135 Wn.2d at 535). For these reasons, we conclude that Brett failed to satisfy his burden of production with regard to undue influence.

But even if Brett *did* satisfy his burden of production, he failed to satisfy his burden of persuasion in light of the rebuttal evidence submitted by Roxie and Jamie. See Mueller, 185 Wn.2d at 15 ("If the facts raise a presumption of undue influence, the burden of production shifts to the will proponent, who must then rebut the presumption with evidence sufficient to 'balance the scales and restore

the equilibrium of evidence touching the validity of the will.' However, the will contestant retains the ultimate burden of proving undue influence by 'clear, cogent, and convincing' evidence." (citation omitted) (quoting Dean, 194 Wash. at 671-72)).

Most significantly, Starkenburg-Kroontje, James's attorney, declared that James made changes to his estate documents at various times over the past 12 years but that since 2007, Roxie and Jamie had been named PRs jointly or individually. Additionally, Starkenburg-Kroontje, who had been advising James for more than 10 years and had met with him more than 30 times, attested that "[a]t no time during the course of our conversation on June 26, 2018[, when James executed the 2018 Will,] did [she] question [James]'s capacity to understand what he was doing." She also observed that James "was articulate and our conversation spanned several different topics." And, she declared that James "expressed frustration with the behavior of his three older children and how they were treating him" and believed the property distribution under the 2018 Will to be fair, even though it may not have been equal.

To this end, Jamie attested in her declaration that James's relationship with his three eldest children had been strained for some time; that Mark, Dana, and Rebecca refused when asked to help Roxie and Jamie care for their father; that Mark frequently showed up to James's house unannounced; that on one such visit in June 2018, Mark angrily confronted James about money; and that shortly after that confrontation, there was another argument involving James and Mark, Rebecca, and Dana.

25

In other words, and even without considering the parts of Jamie's declaration that Brett contends are barred by the dead man's statute,[7] Jamie's declaration, together with Starkenburg-Kroontje's declaration, are sufficient to rebut any presumption of undue influenced raised by Brett's evidence: Starkenburg-Kroontje's observations about James's behavior and capacity at the meeting contradict Brett's assertions that James was susceptible to undue influence.  And her testimony that James expressed frustration with how his three older children were treating him and believed the 2018 Will to be fair, though not strictly equal, contradict Brett's assertions that the 2018 Will was the result of undue influence.  Specifically, together with Jamie's declaration regarding the strained relationship between James and his three oldest children, Starkenburg-Kroontje's testimony presents an explanation, other than undue influence, for the 2018 Will: that James chose to change his will in June 2018 because of his frustration with his oldest children, with whom he had recently argued.[8]

Brett points out that even the trial court "recognized that much of what

---

[7] Jamie also testified that "[i]n early June 2018, my father asked my older siblings to call prior to visiting him at home"; that "my father asked that I take him to Mark's house so he could personally reiterate his desire that my older siblings call before visiting"; and that James asked her to have his locks changed and to take him to Starkenburg-Kroontje's office.

[8] Although Brett contended below that Starkenburg-Kroontje's testimony was barred by the dead man's statute, he does not renew that argument on appeal.  In any event, Starkenburg-Kroontje is neither the executor nor a beneficiary under the 2018 Will.  Therefore, Brett's earlier argument that she is a party in interest to whom the dead man's statute applies is unpersuasive.  Cf. In re Estate of Shaughnessy, 97 Wn.2d 652, 653, 656, 648 P.2d 427 (1982) (holding that attorney who drafted the will in contest *was* a party in interest under the dead man's statute where he was both the executor and a beneficiary under the will).

26

happens in undue influence cases goes on outside of the attorney's office" and that a person can appear to make a choice "but actually be under the influence and control of the individuals [ex]erting undue influence." But Brett bore the ultimate burden to prove clearly, cogently, and convincingly that such influence was in fact exerted. And for reasons already discussed, the evidence Brett presented was not sufficient to meet that burden in light of the contradictory evidence that Roxie and Jamie produced.

As a final matter, Brett contends that the trial court erred by not conducting an on-the-record evaluation of the Dean factors. But he cites no authority for the proposition that the trial court was required to conduct an on-the-record analysis, much less that an on-the-record analysis is required to support a negative conclusion on an issue with respect to which Brett bore the burden of proof. Cf. Eagleview Technologies, Inc. v. Pikover, 192 Wn. App. 299, 314, 365 P.3d 1264 (2015) ("A trial court is 'not required to enter negative findings or findings that a certain fact has not been established.'" (quoting Gen. Indus., Inc. v. Eriksson, 2 Wn. App. 228, 229, 467 P.2d 321 (1970))). Brett's contention fails.

### Fraudulent Inducement

Brett next contends that the trial court erred by denying his petition with regard to fraudulent inducement. We disagree.

Under RCW 11.24.010, "a person interested in a will may, within four months following probate of the will, petition a court . . . and claim that the will was procured by fraud." Lint, 135 Wn.2d at 533. "All of the elements of fraud must . . . be shown . . . in order for the will to be set aside." Lint, 135 Wn.2d at

533. "The elements of fraud are: (1) representation of an existing fact; (2) materiality of the representation; (3) falsity of the representation; (4) knowledge of the falsity or reckless disregard as to its truth; (5) intent to induce reliance on the representation; (6) ignorance of the falsity; (7) reliance on the truth of the representation; (8) justifiable reliance; and (9) damages." Lint, 135 Wn.2d at 533 n.4.

Like claims of undue influence, claims of fraudulent inducement must be proved by clear, cogent, and convincing evidence. Lint, 135 Wn.2d at 533. And as discussed, that standard of proof has two elements: the burden of production and the burden of persuasion. Accordingly, as with a will contestant alleging undue influence, a will contestant alleging fraudulent inducement bears the initial burden of producing substantial evidence to merit the production of rebuttal evidence. Additionally, as with claims of undue influence, the will contestant can satisfy this initial burden by establishing suspicious circumstances under the Dean factors. Dean, 194 Wash. at 672 ("The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence.").

Here, and as discussed in the context of undue influence, Brett failed to satisfy his burden of production via the Dean factors. And although he raises two additional arguments specific to fraud, neither is persuasive.

First, Brett contends that a "piece of evidence demonstrating that Jamie and Roxie would lie to [James] to cause [James] to fear and mistrust [Mark, Dana, and Rebecca] is exemplified through the lies Roxie would tell about

28

Dana's food." To this end, Dana declared that she "cooked dinner for [her] father and mother every night for over a year" and that she "found out later that . . . Roxie would sometimes throw out the food that I cooked and tell my mother and father that I was trying to poison them." But James's late wife, Kathleen, passed away in April 2015. Accordingly, even if Roxie *did* falsely tell Kathleen and James that Dana was trying to poison them, that misrepresentation, made while Kathleen was still alive, was too temporally removed from James's execution of the 2018 Will to constitute a basis for fraudulent inducement. Put another way, Brett's contention fails because he points to no evidence that James relied on the misrepresentation in executing the 2018 Will. See WILL CONTESTS § 8:10 at 463 ("Nor can there be relief if . . . the fraud was not sufficiently near in time to execution to justify a reasonable inference that the testator entertained mistake when doing the testamentary act.").

Brett next contends that the "most damaging falsity that Jamie and Roxie represented to [James] was that Mark intended to put [James] into a nursing home." Specifically, Brett points to the following events that allegedly took place in late May and early June 2018, and that Mark described in his declaration as follows:

> On May 28, 2018 I went to visit my father, but I was turned away. I went back on May 30, 2018 to visit and was turned away again. I returned a third time on June 1, 2018 and Jamie and Roxie attempted to exclude me another time, but I insisted on seeing my father.
> . . . I found my father in his bedroom, laying down on his bed. I was shocked to see that the entire side of my father's face was black and blue with bruising. In explanation of the obvious

29

bruising, my sister Roxie stated that my father kept falling and had hit his face on the bedside table. While Roxie and I were with my father, I asked my father how he came to have the bruises. He repeated exactly the same thing that Roxie had said. I told Roxie that I needed to be informed when issues of this sort happened to my father, but I was never told of any subsequent falls or other injuries or sicknesses.

. . . That same afternoon, after I had already visited with my father in his home, Jamie brought my father to my house. My father was quite weak and ill and should not have been out of bed; he could hardly walk while she pulled him up the sidewalk. Once inside my home, Jamie said to my father "tell him." She repeated it several times forcefully. In response, my father stated to me "Promise me you'll let Roxie take care of me until the end." I promised my father that I would let her take care of him. Then, before leaving, Jamie turned to me and said "By the way, you are no longer in charge. I'm in charge now." She further stated "Don't come see him for two weeks."

. . . .

. . . It was common knowledge in our family that my father was very afraid that he would be put in a nursing home when he got old. He made me promise that I would never allow him to be put in a home. When Jamie came to my house on June 1, 2018 . . . , she kept repeating to my father that "Mark is a greedy man, and he keeps saying you need to go to an age home." . . . I can confirm I had no intention and never spoke of anything related to putting him in a nursing home and fully intended to keep my promise to him.

Brett contends that "coupled with the lie that 'Mark is a greedy man,' it is evident that Jamie intended [James] to believe that Mark wanted [James]'s estate and for that reason wanted to put him in a home." He avers that "multiple witnesses overheard this lie being repeated to [James] only a few weeks before [James] changed his will,"[9] and that because "it was well known among the family that [James] was afraid of being put in a nursing home," James was particularly susceptible to this lie. Brett characterizes this alleged misrepresentation as

---

[9] (Emphasis omitted.)

"textbook fraudulent inducement[ ] as it clearly fulfills every element of fraud and led to the will in contest."

We conclude that these alleged misrepresentations, as well as their temporal proximity to the execution of the 2018 Will, create suspicious circumstances that shifted the burden to Jamie and Roxie.  Nevertheless, Jamie and Roxie came forth with rebuttal evidence "sufficient to 'balance the scales and restore the equilibrium of evidence touching the validity of the will.'"  Mueller, 185 Wn.2d at 15 (quoting Dean, 194 Wash. at 672).  Specifically, and as discussed, Jamie attested in her declaration that James's relationship with his eldest children had been strained for some time.  Jamie also declared that Mark "expressed desire to place [James] in a nursing home" when James was being treated for cancer in 2006 and that when Roxie and Jamie asked for Mark's help with James's care after James returned home, Mark "angrily refused, stating 'No! This is what YOU wanted!'"  Jamie declared that Dana and Rebecca also refused to help with James's care.

With regard to the bruising described in Mark's declaration, Roxie declared that James did suffer a fall in summer of 2018.  She explained that the fall "occurred late at night when my father attempted to get up to use the restroom" and that her understanding was that James "was very susceptible to bruising, due to his advanced age."  Jamie declared that she took James to see his doctor afterward, and no medical concerns were noted.

Additionally, both Roxie and Jamie declared that despite having been treated for cancer in 2006 and though his health declined sharply in the final

31

weeks of his life, James's "health was good after he beat cancer at age eighty-three." Roxie declared that James "was very proactive in maintaining his muscle strength and flexibility and cardiovascular fitness by engaging in daily weight lifting, stationary cycling and walking."

Finally, and as discussed, Jamie declared that Mark frequently showed up to James's house unannounced; that on one such visit in June 2018, Mark angrily confronted James about money; and that shortly after that confrontation, there was an argument involving James and Mark, Rebecca, and Dana.

In short, Roxie and Jamie's evidence contradicts Mark's assertion that he "had no intention and never spoke of anything related to putting [James] in a nursing home," thereby rebutting Brett's contention that Jamie's characterizations of Mark's wishes were false and made with knowledge of their falsity. Furthermore, and as discussed with regard to Brett's undue influence claim, Roxie and Jamie's rebuttal evidence presents a plausible explanation, other than fraud, that James changed his will in 2018: that James's already strained relationship with his eldest children became more strained as a result of the eldest children's refusals to assist with James's care, their unannounced visits to James's home, and Mark's demand for money in June 2018. In light of this plausible explanation presented by Roxie and Jamie's rebuttal evidence, and because Brett points to no evidence of James's reliance on any alleged misrepresentation by Roxie or Jamie, we cannot say that Brett presented clear, cogent, and convincing evidence that the 2018 Will was induced by fraud.

Brett disagrees and asserts that he "has presented evidence of the exact

same situation" as in Lint, where our Supreme Court affirmed the trial court's conclusion that a will was procured by fraud. 135 Wn.2d at 534. But in Lint, there had been a lengthy bench trial with live testimony, and the trial court made extensive findings of fact in the will contestant's favor. 135 Wn.2d at 530. Accordingly, on review, the Supreme Court needed "only to determine whether the evidence viewed most favorable to [the will contestant] supports the challenged finding[s]." Lint, 135 Wn.2d at 532. Here, by contrast, there was no live testimony, the trial court made no findings, and the will contestant—Brett— did not prevail. Accordingly, the evidence that Brett contends he presented to the trial court is not entitled to the same deference in light of Jamie and Roxie's rebuttal evidence.

Moreover, Lint is distinguishable on its facts: In Lint, there was considerable evidence that the testator was experiencing significant cognitive impairment when she executed her last will. See Lint, 135 Wn.2d at 523, 526-27. There was also considerable evidence of the will proponent's fraud: For example, although he was purportedly dating the testator, who was 18 years his senior, he maintained relationships with other women, including a longtime girlfriend. Lint, 135 Wn.2d at 522. He also attempted to be named the testator's attorney in fact, fired the testator's housekeeper of 15 years and replaced her with his own employees, instructed the testator's hospice nurse not to respond to inquiries about her health and not to record anything in her logbook that would suggest the testator was incompetent, and married the testator in a "mock ceremony," the video of which revealed that the testator "was unable to complete sentences or

33

repeat words after they were spoken to her." Lint, 135 Wn.2d at 523-26. Lint is not persuasive here.

Brett also contends, as he did with regard to undue influence, that the trial court erred by not conducting an on-the-record analysis of each of the elements of fraud. But Brett again cites no authority that requires the trial court to do so, and as discussed, a trial court is not required to enter negative findings.

As a final matter, at oral argument before this court, Brett's counsel suggested that the trial court erred inasmuch as it treated the hearing on Brett's petition to invalidate the 2018 Will as a hearing on the merits, without giving Brett an opportunity to conduct additional discovery and present live testimony. But in Brett's opening brief, Brett argued only that he conclusively *proved* fraud and undue influence based on the evidence submitted to the trial court. He did argue, with regard to his petition to remove Roxie and Jamie as PRs, that additional discovery was warranted to investigate Jamie and Roxie's alleged breaches of their fiduciary duties. But he did not argue, with regard to his petition to invalidate the 2018 Will, that he should have been permitted to conduct discovery and present live testimony, much less support any such argument with relevant authority. Cf. RCW 11.96A.100(7) (providing that "[t]estimony of witnesses may be by affidavit"). Accordingly, we do not consider Brett's contention that the trial court erred by treating the hearing on Brett's will contest as a hearing on the merits and deciding the issue without additional discovery or live testimony. See Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (appellate court "will not consider an

34

inadequately briefed argument").

PETITION TO REMOVE PERSONAL REPRESENTATIVES

Brett contends that the trial court erred by denying his petition to remove Roxie and Jamie as personal representatives of James's estate. We disagree.

Under RCW 11.68.070, the court may, upon petition by certain interested parties, remove or restrict the powers of a nonintervention PR if the PR "fails to execute his or her trust faithfully or is subject to removal for any reason specified in RCW 11.28.250." RCW 11.28.250 authorizes the court to remove a PR who has "wasted, embezzled, or mismanaged, or is about to waste, or embezzle the property of the estate" or "for any other cause or reason which to the court appears necessary." Although Brett is correct that any findings the trial court makes in connection with its decision to remove a personal representative are reviewed for substantial evidence, see In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004), a trial court's ultimate decision whether to remove a personal representative "receives considerable deference and will not be disturbed absent a manifest abuse of discretion." In re Estate of Jones, 116 Wn. App. 353, 361, 67 P.3d 1113 (2003), rev'd on other grounds, 152 Wn.2d 1, 93 P.3d 147 (2004).

Here, Brett does not argue on appeal that Roxie and Jamie should have been removed as PRs because they did, or were about to, waste, embezzle, or mismanage the property of the estate. Instead, his argument that Roxie and Jamie should have been removed as PRs rests entirely on his assertions that Roxie and Jamie unduly influenced and fraudulently induced James, and that this conduct constituted an "other cause or reason" for removal under

35

RCW 11.28.250. His argument fails for three reasons.

First, we assume without deciding that a PR's procurement of the will the PR is charged with executing, through undue influence or fraud, is an "other cause or reason" for removal under RCW 11.28.250. But as discussed, Brett failed to establish that Roxie and Jamie procured the 2018 Will through undue influence or fraud.

Second, Brett cites no authority supporting the proposition that a PR's undue influence or fraud *necessitates* removal. He points to Haviland, where we affirmed the trial court's conclusion that the PR procured the will by undue influence and the trial court's removal of the PR. 162 Wn. App. at 552, 557. But nothing in Haviland indicates that the PR's removal was a consequence of the PR's undue influence, and a later Supreme Court decision in Haviland indicates that the PR was removed not because of undue influence, but because of her ineligibility due to past criminal convictions. In re Estate of Haviland, 177 Wn.2d 68, 72, 301 P.3d 31 (2013). Therefore, Brett's reliance on Haviland is misplaced.

Finally, as the trial court observed, Brett petitioned for removal only a very short time after letters testamentary were issued. Furthermore, Roxie and Jamie each submitted declarations confirming that they had been advised of and understood their fiduciary duties and describing the activities they had undertaken since being appointed, including gathering and securing James's personal property, insuring high-value items, notifying tenants and doctors, closing bank accounts, notifying creditors, paying outstanding debts, opening an estate bank account, obtaining appraisals, and closing credit card accounts.

Under these circumstances, we cannot say that the trial court abused its discretion by denying Brett's petition to remove Roxie and Jamie as PRs.

As a final matter, Brett contends in the alternative that remand is required to allow him to conduct discovery into his suspicions that Roxie and Jamie are committing waste by allowing Roxie to live on the estate rent free, logging an estate property, and hiding estate assets. He argues that "RCW 11.28.250 and RCW 11.68.070 were clearly created with the intention of protecting beneficiaries' rights and removing improper personal representatives who cannot and will not fulfill their fiduciary duties." He argues further that it would be "unjust" to not allow him to conduct discovery because he "has not had the opportunity to fully prove that Roxie and Jamie are not fulfilling their fiduciary duties" and that this situation is "totally contrary to the entire purpose of RCW 11.28.250 and RCW 11.68.070."

But Brett cites no authority for the proposition that the trial court was required to allow discovery, and his arguments ignore the fact that James's estate was declared a nonintervention estate, for which "the statutory objective is to simplify the probate actions and procedures by minimizing court involvement." 26B WASHINGTON PRACTICE: PROBATE LAW AND PRACTICE § 12:2 at 194; see also Rathbone, 190 Wn.2d at 339 ("Once a court declares a nonintervention estate solvent, the court has no role in the administration of the estate except under narrow, statutorily created exceptions that give courts limited authority to intervene."). They also ignore that there are other statutory means of obtaining information that already balance an interested party's desire for information

against the "substantial independence" afforded to nonintervention PRs. See 26B WASHINGTON PRACTICE: PROBATE LAW AND PRACTICE § 1:3 at 4. For example, RCW 11.68.065 provides a means for a beneficiary to request "a report of the affairs of the estate," and RCW 11.68.110 provides a means for interested parties to petition the court for an accounting upon the completion of probate and before the PR is discharged.

Furthermore, Brett does not dispute Roxie and Jamie's assertion that the procedures set forth in RCW 11.96A.100 applied to his petition. Under RCW 11.96A.100(8), "[u]nless requested otherwise by a party *in a petition or answer*, the initial hearing *must* be a hearing on the merits to resolve all issues of fact and issues of law." (Emphasis added.) Here, Brett did not request, in his petition to remove Roxie and Jamie as PRs, that the trial court's initial hearing not be a hearing on the merits. For these reasons, we decline to remand for discovery.

Brett points out that under RCW 11.96A.100(9), "[a]ny party may move the court for an order relating to a procedural matter, including discovery, . . . in the original petition, answer, response, or reply, or in a separate motion, or at any other time." He then asserts that he made a "proper request for discovery" at the hearing before the trial court. Specifically, at the hearing, Roxie and Jamie indicated through counsel that if the court were inclined not to deny Brett's petition outright, their "fallback position" was that the matter should be set for trial. Brett's counsel then indicated her agreement that "this is a case that would benefit from quite a bit of discovery, depositions, interrogatories, request[s] for production[ ], et cetera, because there's a lot of information out there." But even

if Brett's counsel's agreement that discovery would be desirable was a proper motion under RCW 11.96A.100(9), for reasons already discussed, Brett does not persuade us that the trial court erred by denying that motion.

ATTORNEY FEES

As a final matter, Roxie and Jamie request fees on appeal pursuant to RCW 11.24.050. That statute provides that if a contested will is sustained, "the court may assess the costs against the contestant, including, unless it appears that the contestant acted with probable cause and in good faith, such reasonable attorney's fees as the court may deem proper." RCW 11.24.050. The statute "allow[s] the court to exercise considerable discretion." Atkinson v. Estate of Hook, 193 Wn. App. 862, 874, 374 P.3d 215 (2016).

A will proponent is not entitled to fees merely because the will contestant did not prevail in overthrowing the will. In re Estate of Kubick, 9 Wn. App. 413, 420, 513 P.2d 76 (1973). That said, "when a contestant does not make a prima facie case, and merely offers evidence which the trial court is justified in holding as a matter of law does not require any proof to combat it, attorney's fees should be charged against the contestant." Barbee v. Barbee, 134 Wash. 318, 423, 235 P. 945 (1925). Thus, for example, in Barbee, our Supreme Court upheld a fee award against children who unsuccessfully contested their mother's will where there was evidence that "the petitioners knew at the time they brought the action that [their mother] was displeased with them, and had every reason to believe any will which she might make would not provide for her children equally." 134 Wash. at 422-23. By contrast, we have declined to award fees to an

39

unsuccessful will contestant where the will contestant "raised a number of valid and debatable issues concerning the result." Kessler, 95 Wn. App. at 382. Specifically, in Kessler, we declined to award attorney fees to the will proponent where the question of testamentary capacity was "a close one" and the will contestant successfully raised a presumption of fraud and undue influence. 95 Wn. App. at 373, 375-76, 378-79.

We deny Roxie and Jamie's request for fees on appeal for three reasons. First, although Brett failed to establish his standing and failed to raise a presumption of undue influence, Roxie and Jamie did not argue the issue of standing below, and Brett did, as discussed, satisfy his burden of production with regard to at least one aspect of his fraud claim. Second, this case is not as extreme as Barbee, where there was evidence of the will contestants' knowledge of their mother's displeasure with them and that "[t]hey not only knew of the ill feeling, but what caused it, and the part each had played therein, for they had discussed the matter with their mother." Barbee, 134 Wash. at 423. Third and finally, although Roxie and Jamie assert that they are entitled to fees, they provide no argument as to RCW 11.24.050's good faith inquiry, which is distinct from the issue of whether the trial court erred with regard to the merits of Brett's claims. See Kessler, 95 Wn. App. at 370 ("[I]n considering the question whether [the will contestants] acted in good faith and on probable cause in contesting the will . . . , we have treated that question and the question whether they prevailed on the merits as two distinct questions. To do otherwise 'would be to do a great wrong and tend to discourage the assertion of legitimate claims.'" (quoting In re

Estate of Eichler, 102 Wash. 497, 500-01, 173 P. 435 (1918))); see also Phillips

Bldg. Co. v. An, 81 Wn. App. 696, 705, 915 P.2d 1146 (1996) ("Argument and

citation to authority are required under [RAP 18.1].").

    We affirm.

_____

WE CONCUR:

_____       _____